(No. 69161.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOE BURROWS, Appellant.

*Opinion filed March 26, 1992.—Rehearing denied June 1, 1992.*

Charles M. Schiedel, Deputy Defender, and John J. Hanlon, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn Kaplan, Solicitor General, and Terence M. Madsen and Douglas K. Smith, Assistant Attorneys General, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

The defendant, Joe Burrows, was indicted, along with Ralph Frye and Gayle Potter, by an Iroquois County grand jury for the murder and armed robbery of an 88-year-old man, William Dulin (Dulin). Defendant's motion

for severance was allowed, and after his first trial resulted in a mistrial, he was retried and a jury found him guilty of murder and armed robbery. At his sentencing hearing, defendant waived his right to a jury and the court sentenced him to death. Defendant's death sentence was stayed (134 Ill. 2d R. 609(a)) pending direct review by this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603).

The pretrial issues that defendant raises are as follows: (1) whether the trial court erred in refusing to dismiss his indictment where the prosecutor did not present the statements of Rick Troyer, Charles Gullion, and Rick Gillespie to the grand jury; and (2) whether defendant was denied the due process of law where the prosecutor and the trial court refused his request to have Gullion and Gillespie immunized from prosecution.

Defendant raises the following issues relative to the guilt phase of the trial: (1) whether he was proven guilty beyond a reasonable doubt; (2) whether the testimony of Frye's defense attorney was irrelevant and prejudicial; (3) whether defendant was denied effective assistance of counsel; (4) whether defendant's confrontation and due process rights were denied when the court made remarks to the jury as to the reasons for the delay in Frye's sentencing hearing; (5) whether the State's closing argument denied defendant a fair trial; and (6) whether the court erred in admitting Potter's testimony from Frye's trial.

Concerning defendant's sentencing hearing, defendant raises the following issues: (1) whether the court's finding of only one mitigating factor was proper; (2) whether the court was correct in finding defendant eligible for the death penalty; (3) whether double jeopardy principles prohibited the State from seeking the death penalty; and (4) whether defendant's sentencing hearing

was unfair in that the State was not limited to one closing argument.

Lastly, defendant challenges the constitutionality of the death penalty statute.

The State presented the following evidence at defendant's trial. Patricia Swan, Dulin's daughter, and her husband, Robert Swan, testified that on Tuesday, November 8, 1988, they traveled from their Indiana home to Dulin's home, which was located in Sheldon, Illinois. They arrived at Dulin's home, knocked on his front door, walked inside, and found Dulin lying face up on the living room floor. He appeared to be dead, so Robert Swan contacted the police.

Lieutenant Robert L. Flesher, of the Iroquois County sheriff's department, testified that on November 8, 1988, at approximately 8:45 a.m., he was notified that a man was found dead at the Dulin residence. He went there and found Dulin lying just inside the front door. Flesher contacted the sheriff's department and asked that the sheriff report to the crime scene.

Tommy Martin, a crime scene technician with the Illinois State Police, received an assist call from Iroquois County and went to the crime scene accompanied by the sheriff and the coroner. He investigated the scene and his testimony in this regard was generally as follows: he checked for signs of forced entry around the Dulin home but found none; he did a "walk through" of the living room and, afterwards, he took photographs of the crime scene; he observed a white male clothed only in long underwear lying face up just inside the front door; he discovered plaster near the body and thought that it had come from the ceiling because there were two holes and a deflection mark in the ceiling; he recovered a BB gun safety and a slug from a throw rug near the body; he also recovered a flattened slug that had plaster imbedded in it; this particular slug was found on the floor near

the living room wall and it matched with the deflection mark in the ceiling; he checked the residence for fingerprints, but no identifiable prints were found; however, he did discover fabric marks (resembling a clothing weave) on several areas within the living room—on the bedroom door, on the inside of the front door, on picture frame glass, and on the living room desk (on cross-examination he admitted that, in his prior testimony, he did not mention that there were fabric marks on the desk); he stated that fabric marks can occur by brushing up against a surface, through normal cleaning and dusting, or by intentionally wiping a surface for the purpose of removing fingerprints; blood samples were also taken from the living room wall on either side of the front door, from an envelope and some pieces of paper that were on the living room desk, and from the threshold area of the front door (a serologist testified that tests performed on blood stains taken from papers found on Dulin's desk could have originated from Potter, but not from defendant, Dulin, or Frye); he witnessed the autopsy; he observed wounds to Dulin's hands and noticed that his fingernails were broken—this was an indication that some type of struggle had taken place; he pulled Dulin's skin back and, with the aid of a high-powered flashlight, he did not find any flesh, hair, fibers or blood under his fingernails; he noticed there was a black sooty substance, which appeared to be gunpowder, on the right sleeve of Dulin's long underwear top; and he recovered a third slug when the coroner removed one from Dulin's neck area and gave it to him.

James Roberts, a firearm and tool mark specialist, testified that he received a nine-shot, .22-caliber revolver from John Dierker, a forensic scientist, and three .22-caliber slugs from Tommy Martin, a crime scene technician. He test fired the gun and determined that the three slugs could have been fired from the revolver.

Dr. James Blanding, a general pathologist, performed an autopsy on Dulin and his testimony was generally as follows: he noticed wounds to both of his hands and that his fingernails were "broken off in different areas"; there was a graze or "through and through" wound to the left shoulder where a bullet had passed through; there was a pattern abrasion to the posterior side of his left shoulder which he opined resulted from either the victim's crawling or being dragged; there was a gunshot wound just above the left ear and it appeared to be a relatively close shot because there was unburned gunpowder about an inch and a half in diameter around the wound; the appearance of gunpowder in this manner would indicate that the weapon was fired from a distance of 12 to 18 inches from the victim's head; he determined that the trajectory of the bullet was slightly downward; in the course of his internal examination he removed a .22-caliber bullet from a muscle in Dulin's neck; and it appeared that the bullet passed through the most vital areas of the brain, thus causing an instantaneous death.

Patricia Swan and her sister, Catherine Compton, each testified that their father, William Dulin, owned two billfolds and an inexpensive gold-plated money clip. Their father would ordinarily keep one of the billfolds and the money clip in his pants pocket. They went through their father's personal effects and could not find either of the two billfolds or his money clip. Swan testified that her father owned a BB pistol and that he usually had it hanging on the living room wall. However, she had not been able to find the pistol since she entered her father's house on November 8, 1988. Compton testified that she could not find her father's checkbook, but she did find some counter checks. See Webster's Third New International Dictionary 519 (1986) (a counter

check is "a blank check obtainable at a bank esp. to be cashed only at the bank by the drawer").

Richard Hill, an employee of the Iroquois Farmers State Bank, testified that on November 8, 1988, he was working in the back room of the bank. He looked out the window of the bank and noticed a dark-colored, General Motors automobile. There were two individuals in the car—a bearded man with dark bushy hair and a blond-headed woman. Vesta Metz, another bank employee, testified that on November 8, 1988, a man, whom she identified from a photograph at trial as Gullion, came into the bank wearing a shirt with the name "Chuck" and "K & C Auto" embroidered on it. He attempted to cash a yellow counter check in the amount of $4,050. The check had Dulin's signature on it but she recognized that the signature was not in Dulin's handwriting. She advised him that the check could not be cashed and that Dulin was dead. The man took the check and left the bank.

Gayle Potter, a codefendant who, at the time of defendant's trial, was awaiting trial on charges of murder, armed robbery, forgery, and attempted theft due to her involvement in Dulin's death, provided the following background information: she became acquainted with Dulin through her mother because her mother was Dulin's housekeeper and her mother also provided nursing care for his wife; Potter considered Dulin a friend and, over a two-year period, she had borrowed money from Dulin four times; on one occasion in August of 1988, defendant went with her to Dulin's home when she borrowed some money; she admitted to being a drug dealer and that Steve Poll, a Mobil gas station employee, would "front" her cocaine and then she would sell it to four different individuals who "would break it down and sell it on the street"; defendant was "involved" with Poll and would collect money for Poll when people would not

pay; she described Gullion as her "right-hand man" who sold the largest amount of cocaine for her; in late October of 1988, she made arrangements to travel with her boyfriend, Gillespie, to Florida and "get away from the dealers"; prior to leaving, she left one-half ounce of cocaine with Gullion and instructed him to sell it and pay Poll before picking up any more cocaine; while in Florida, she contacted Gullion and he informed her that there were problems with the drug business; she then contacted Poll from Florida and he informed her that Gullion did not pay for the half ounce and that money was owed to him; she returned from Florida on November 5, 1988, and found that the trailer she lived in with Gillespie had been "broken into"; she noticed that a telephone answering machine, a chain saw, a Mexican shawl, a gun that Gullion had given her, a gold wedding band, some liquor, and drug paraphernalia were missing; she said the gun that was taken was needed because she was sometimes home alone and she handled large amounts of money and drugs; Potter identified the gun that was used to kill Dulin as the same gun that was stolen from her trailer; Poll told her that she owed him $3,000 and on Sunday morning, November 6, 1988, she had a telephone conversation with Poll in which he suggested that she borrow the money from "that rich, old farmer"; she claimed Poll knew about Dulin because defendant told Poll about a retired farmer who lent her money; she contacted Dulin that Sunday afternoon to see if he would be home during the evening because she intended to go to his home and ask for a loan (she did not notify Dulin of the purpose of her visit); and she then went to the Mobil station at Poll's request.

Potter then testified that the following transpired between the time she arrived at the Mobil station and the time she visited Dulin's home: she saw defendant and Poll at the gas station; she was unsure whether she

could come up with the money and Poll told defendant to "persuade" her that the money was needed; defendant then hit her with a piece of wood; defendant left the station and returned with Frye and an argument ensued over money; defendant then hit her in the head with a gun and she was shoved outside of the gas station office; she was called back inside and Poll told her that he "was going to send the guys," meaning defendant and Frye, up to Dulin's home in Iroquois County; they agreed to meet at the Value Village parking lot in Watseka around 10 or 11 o'clock Sunday night; she traveled to Watseka in Gullion's father's car—a black Oldsmobile—along with Gullion and Gillespie, and they stopped at her step-cousin's (Rick Troyer's) apartment; she dropped Gullion and Gillespie off at Troyer's place and, using Gullion's car, she drove to the Value Village parking lot; there she met defendant and Frye who were waiting in a truck; and they then followed her to Dulin's home.

Potter testified that the following occurred at Dulin's home: she walked across the front porch and knocked on the front door; Dulin recognized her, let her in, and defendant and Frye pushed their way in behind her; she asked Dulin for a $3,000 loan and he said that he did not have that kind of money; defendant then pulled out a gun from his waistband and told Dulin to write out a check; Dulin lunged for the gun and he began to struggle with defendant; Dulin reached for a BB gun but defendant quickly knocked it from his hands; shots went off and Dulin was shoved by defendant; Dulin was crying and out of breath, and said that there was no need to kill him; defendant smiled and shot Dulin in the head (she made an in-court identification of defendant as the person who shot Dulin); she became hysterical and defendant forced her head down onto the living room desk, hit her on the head and she began bleeding; she was shoved outside and forced into the truck with Frye;

the murder weapon was on the floor of the truck; defendant went back inside, saying he had to wipe things off to remove any fingerprints; defendant came out of the house carrying papers, clothing, a BB gun, and a paper sack; defendant placed some of the items behind the truck seat and took the gun from Frye and walked over to Gullion's car; and after defendant and Frye departed in their truck, Potter went to Wally Urban's house for help.

Potter knocked on Urban's door and Mary Harwood answered, saying Urban was asleep and did not want to be disturbed; she returned to Dulin's to see if he was alive and noticed that he was not breathing; she then went to Troyer's apartment and told Troyer, Gillespie, and Gullion that a drug deal had gone bad (she stated that she gave this false story because she was threatened by defendant); she washed off the blood on her head (at trial, she identified some photographs which were taken of her two or three days after the incident that depicted some cuts and bruises on her head); after she smoked some pot, she returned to Champaign with Gillespie and Gullion; Gullion dropped her and Gillespie off at their trailer home, but before he left, Gullion brought in a paper sack and set it next to the front door; and she claimed that she did not know what the paper sack contained.

Potter further testified that on the next day, November 7, 1988, defendant and Poll stopped by her trailer and gave her a yellowish-orange check in the amount of $4,050; the check had Dulin's signature on it; Poll told her that the check had to be cashed, otherwise she or a member of her family would be "taken out"; the next day, Gullion took her to the Iroquois Farmers State Bank to cash the check at the drawee bank; Gullion went into the bank and returned saying the check was no

good; she burned the check; and while heading towards Milford, Illinois, they were both arrested.

On cross-examination, defense counsel elicited the following testimony from Potter: that prior to her arrest she knew the defendant quite well and that he "ran around" with Frye; that on November 6, 1988, she was a drug addict and a drug dealer; at the time of her arrest, the sheriff told her that things would go better for her if she cooperated; that her case had been continued so she could testify at defendant's trial; that she admitted that she had been previously convicted of forgery, auto theft, and petty theft; that she owned the murder weapon and she arranged to have Gillespie hide the weapon outside of her trailer; that defendant used her gun to kill Dulin; and that he had received her gun from defendant's brother, Charles Burrows, who she believed broke into her trailer.

Shortly after her arrest she told the sheriff: she was not at Dulin's home and did not know Dulin was dead; she was in the house but did not do it; she traveled to Watseka with defendant and Frye; defendant and Frye pushed her into the pickup because she wanted it to appear that she was forced to go to Dulin's house; and she was dumped off at her trailer and beaten by defendant and Frye.

On cross-examination she further stated: that she lied in her taped statement to the sheriff in order to protect herself, Gillespie, Gullion, and Poll; that she did not tell the sheriff that her gun was used because she feared that she would be blamed for the murder; that she changed her story after her nephew was raped and brutalized; that although her sister's live-in boyfriend was convicted of the crime against her nephew, she held defendant responsible; that she is confined with Frye on the second floor of the Iroquois County jail and can communicate with him through a food slot; that as she drove

to Urban's house to get help, she passed the Iroquois County sheriff's office without stopping; and that she had written a letter to Frye's attorney in which she stated that Frye was not at the crime scene.

Robert George, an investigator for the Iroquois County sheriff's police, testified that a dark-colored Oldsmobile was stopped and Gullion and Potter were arrested. On the day Potter was arrested, he noticed that she had a bloody laceration on the back of her head and bruises behind her left ear. He arrested Frye and took a statement from him. In his statement, Frye told him things about Dulin's death of which he was unaware: the number of bullet holes in the ceiling of Dulin's house; that a gold money clip had been taken from Dulin; and that Dulin's pants had been taken. He also took taped statements from Gullion and Gillespie. With Gillespie's help, he obtained a brown paper bag which contained a handgun, a stocking hat, some .22-caliber ammunition, and a partial grocery list (a documents examiner testified that the grocery list was in Dulin's handwriting); the bag had been recovered from a wooded area near the trailer park that Gillespie and Potter resided in.

Rick Troyer, Potter's step-cousin, gave the following testimony relative to the events within his Watseka apartment on Sunday, November 6, 1988: Potter, Gillespie and Gullion visited his apartment around 10 p.m.; Potter was given some keys from Gullion and she left the apartment; she returned shortly after midnight with blood on her head and she was holding a pair of pants, a shirt, and a coat; and she cleaned up in the bathroom, sat down for a short time, and left the apartment with Gillespie and Gullion.

On cross-examination, defense counsel elicited the following testimony from Troyer: when Potter returned to his apartment she was carrying a pair of pants; he remembered Potter telling him that she had the pants be-

cause "she had stripped the body to protect Shaun" (Potter stated that she did not tell Troyer, Gullion or Gillespie what "actually" happened because she did not want them involved); she also told him that she "stripped the body and took everything that tied Shaun to the scene"; when Potter entered the apartment, she put a stack of money on his coffee table and said, "I thought there would be more than two hundred fifty dollars there"; she claimed that she was wounded as a result of getting "bushwhacked" at a drug deal; he heard Potter tell Gullion there was a .22-caliber gun in the car; and Gullion went downstairs and came back into the apartment with "like eight or nine shells *** four or five of them were spent and four or five of them weren't."

Frye testified at length and his testimony regarding the events leading up to his presence at Dulin's home was as follows: he indicated that defendant was a friend of his whom he had known for approximately 12 to 14 years; he also lived with defendant in Ogden, Illinois, for about a month in May 1988; while walking from his father's house, he saw defendant in a blue, Chevy pickup truck at the Kerr-McGee gas station; defendant told him that "he had to go find a way to pick up some money"; he left with defendant in the pickup truck and traveled to a Mobil station; defendant went inside and minutes later Potter walked outside holding her head; Potter went back inside the station and came outside again, telling defendant to "meet her up at the east end of town in Watseka, Illinois, at the Value Village parking lot"; defendant dropped him off at his trailer and, about an hour later, defendant picked him up in the same blue pickup truck, and they drove to Watseka; and after Potter pulled into the Value Village lot driving a dark-colored Oldsmobile, they followed her to a farm house.

Frye then gave the following testimony about what had occurred later on that evening: he and defendant

went with Potter to the front door of a farmhouse after Potter "said there was no reason for us to sit in the truck"; Potter knocked on the door and an elderly man answered; she asked him for a $3,000 loan, but he said that he did not have that kind of money; he invited them inside his house and Dulin again refused Potter's loan request; defendant stepped in, shoved Dulin, and pulled a gun from his waistband; defendant and Dulin struggled over the gun; in the meantime, Potter tried to intervene and Frye knocked a lamp from her hands; shots were fired and Dulin was shoved backwards; defendant said, "you old son-of-a-bitch, you could have at least given us the money, we wouldn't have to go through all of this"; defendant then shot Dulin in the head; Potter became hysterical and she said she was going to call the police; defendant knocked the telephone out of her hands and had her on the top of the desk; defendant then hit Potter with the butt end of the gun on the left side of her face; defendant stopped hitting Potter and picked up a gold-colored check from the desk; defendant pulled off Dulin's pants and showed Frye a gold money clip that he had found; the three went outside and Frye put Potter in the truck; Frye was given the gun from the defendant and he placed it on the floorboard of the truck; defendant went back inside the farmhouse saying he was going to "wipe prints and things off"; defendant returned a few minutes later with some clothes and a grocery bag; defendant asked for the gun and Frye gave it to him; defendant put the grocery bag in Potter's car and placed Dulin's pants behind the seat of the truck; defendant told Potter to leave and threatened to kill her if she opened her mouth; defendant climbed into the truck, took a wallet out of Dulin's pants, and threw the pants out the truck window; Frye was dropped off at his trailer and was arrested there at 4:30 a.m. on November 9, 1988; and between the time he returned to his trailer

and the time he was arrested, he did not see or converse with either defendant or Potter.

On cross-examination, defense counsel elicited the following testimony from Frye: he admitted to having a learning disability; he had previous convictions for burglary and theft; he was also convicted of the murder and armed robbery of Dulin and was waiting to be sentenced; on November 6, 1988, he went to a hospital and took some medication because he was sick; he was arrested November 9, 1988, and he gave a taped statement shortly after his arrest; he admitted to making a mistake in that statement when he told the police that he traveled to Watseka with Potter and defendant in defendant's pickup truck; he gave a false statement to the police when he told the police that the pickup truck was left near an airport; in his post-arrest statement he also said that there was a hallway in Dulin's house and that defendant had a .38-caliber gun; he acknowledged that he can talk with Potter through a pan hole at the jail and that they talk to each other all the time; he admitted that after his conviction, he wrote a letter to a judge telling him that the taped statement he had given the police was a lie and that he was not at Dulin's home (on redirect, Frye said that Boyer (defendant's attorney) told him if he wrote the letter, he would try to represent him and get him out of jail); and he admitted that he lied when he stated at a hearing that his lawyer and the prosecuting attorney told him he would get life unless he testified against the defendant.

A tape was played of a statement Frye had given to defendant's attorneys, Ron Boyer and Mark Thompson. In the taped statement, Frye said that he was not present when Dulin was murdered and that he gave a post-arrest statement because police officers were jumping down his throat and telling him things.

The State also called Frye's attorney, Michael Jones, to the stand, and he testified that he was unaware that his client had given a taped statement to Boyer and Thompson, defendant's attorneys. Jones also stated that he informed Boyer that he did not have his permission to talk to his client.

Defendant called a number of witnesses to the stand. Lydia Gullion, Chuck Gullion's wife, testified that on November 5, 1988, she went with her husband to pick up Potter and Gillespie from the airport. They drove them back to the trailer park where Potter lived with Gillespie. When they arrived at Gillespie's trailer, they noticed the doors had been jimmied as if someone had broken into the trailer. Lydia testified that a chain saw, a telephone cord, and an answering machine were missing. She saw her husband take a gun out of his pocket, which she recognized as her husband's gun, and give it to Potter.

Terry Reed, a deputy sheriff in Champaign County, testified that he investigated a burglary at Gillespie's trailer on November 11, 1988. All that was reported missing was an answering machine and a chain saw.

Gillespie and Chuck Gullion were called to testify and each exercised his fifth amendment rights.

Poll testified that he knew Potter because he acted as a "go between" on a car she had purchased. Poll claimed that Potter "blew the car up," returned it, and asked him to fix it. He said that he did not see Potter at the gas station on November 6, 1988, and that he had never met the defendant.

Joanne Espeland, defendant's former neighbor, testified as follows: on Sunday, November 6, 1988, she saw defendant at his home at about 8:30 a.m.; the last time she saw defendant that day was at approximately 7:30 p.m., when she went to his home to pick up her daughter; while she was there that evening she saw defendant

and Murray Kellems leave in a blue Pinto to pick up some cigarettes and pop; defendant and Kellems returned and left defendant's home again around 8 p.m.; and she never saw defendant drive a pickup.

Doreen McDuffie, an employee of a Checker gas station in Homer, Illinois, stated that she knew the defendant as a customer of the gas station. Although she generally worked Sundays, she could not say for sure whether she saw defendant at the gas station on Sunday, November 6, 1988, because she would sometimes switch days with another girl.

Lillian Sue Rodgers, the mother of Frye's live-in girlfriend, Tonya Rutledge, testified that her daughter and Frye came to her home in Oakwood, Illinois, on November 6, 1988. They arrived around 3:30 p.m. and left "between a quarter after and 6:30 p.m." On cross-examination, Rodgers testified that she knew defendant's brother, Dennis Burrows, because her daughter lived with him at one time.

Greg Thomas, brother of Frye's girlfriend, testified that he lived with Frye, his sister, and her two children. On Sunday, November 6, 1988, he worked from 2 p.m. to 10 p.m. He drove home after work and arrived at 10:20 p.m. He knocked on the front door to the trailer and Frye directed him around the back so as not to wake the children.

Joseph Mathy, Iroquois County sheriff, testified that when he first arrested Potter she denied that she was aware of Dulin's death and she also stated that she was not at Dulin's home. But after further questioning, she indicated that she may have set up Dulin's robbery because defendant had previously accompanied her on a prior trip to Dulin's house. He also stated that his office obtained tape-recorded statements from Gullion and Gillespie, and these were admitted into evidence.

On rebuttal, the State called Iroquois County Investigator George in an effort to attack the alibi testimony of Espeland. George testified that he had a conversation with Joanne Espeland at her residence and she stated at that time that she saw defendant two days prior to his arrest—which he understood to be Monday.

A jury found defendant guilty of the murder and armed robbery of William Dulin. Defendant waived his right to have a jury determine whether he should be sentenced to death. The parties stipulated that defendant was at least 18 years of age at the time of the offense (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)) and the court took judicial notice that certain aggravating factors were in existence which permitted the State to seek the death penalty.

The State presented the following evidence in aggravation. Malcolm Harrell, correctional officer at the Iroquois County jail, testified that defendant misbehaved in jail and, on one occasion, defendant threatened to beat his head off his shoulders.

Charles White, who was incarcerated with defendant at the jail, testified that defendant told him that his wife, Sherri Burrows, would give him marijuana on Saturdays. White would do favors for defendant and defendant would give him "pin joints." Richard Price, under-sheriff for Iroquois County, received a marijuana cigarette from White and White claimed he had received it from defendant. Nita Dubble, communications supervisor with the sheriff's office, searched Sherri Burrows on Saturday, June 10, 1989, and found a white envelope in her pants pocket that contained marijuana.

Kenneth Mattox, defendant's brother-in-law, also testified on behalf of the State. He testified that he remembered one instance where he went home and observed his sister crying. Defendant came to the door but he did not let him in. Defendant threatened to kill him. Defend-

ant left and then returned and said to his wife, "I'll kill you, you bitch."

Defendant presented the following evidence in mitigation. Kevin Ward, jail administrator, testified that he saw defendant regularly and defendant never threatened him or gave him any difficulties. Karen Grey, whose son was defendant's friend, described defendant as very polite. John Espeland, defendant's former neighbor, described defendant as a pretty nice guy who sometimes cared for the Espeland children. Joanne Espeland, John's ex-wife, described defendant as a very loving father. Debbie Burrows, defendant's sister-in-law, described him as a "light-hearted, happy-go-lucky person." Randall Mattox, defendant's brother-in-law, described defendant as very outgoing and caring for other people. Carlos Burrows, defendant's father, considered his son to be very concerned and sympathetic towards older people. Sherri Burrows, defendant's wife, stated that she loved her husband and that her family, the Mattoxes, never liked her husband; and that her husband always cooked, did household chores, maintained a good relationship with the kids, and would do things for other people.

After considering all of the evidence in aggravation and mitigation, the court found that there were no sufficient mitigating factors which would preclude the imposition of the death penalty. Defendant was sentenced to death.

## PRETRIAL ISSUES

Defendant contends that the court erred in refusing to quash his indictment because a due process violation occurred when the State tendered only the statements of Potter and Frye to the grand jury and withheld the statements of Gillespie, Gullion, and Troyer. Defendant maintains that, had the three additional statements been tendered to the grand jury, the credibility of Potter and

Frye would have been undermined. The State character-
izes defendant's arguments as "specious" and explains
that the three men did not witness Dulin's death.

A trial court is empowered with the authority to dis-
miss a criminal indictment where a person's due process
rights have clearly been denied. (*People v. Lawson*
(1977), 67 Ill. 2d 449, 455.) To support a claim that an
indictment should be dismissed because of a due process
violation, a defendant must show both actual and sub-
stantial prejudice. (*Lawson*, 67 Ill. 2d at 456.) After re-
viewing the record, we do not find that defendant was
substantially prejudiced by the State's failure to present
the statements of Gillespie, Gullion, and Troyer.

The only witness to appear at the grand jury proceed-
ing was Iroquois County Sheriff Joseph Mathy. He testi-
fied generally to the facts his department uncovered in
its investigation of Dulin's death. The taped statements
of Potter and Frye were also played. These two tape-re-
corded statements were of the two eyewitnesses who al-
legedly saw defendant shoot and kill Dulin. Thus, there
was no prosecutorial misconduct here because the basic
facts describing what transpired within the Dulin home
on November 6, 1988, were presented to the grand jury.
"There is no burden on the State to present all available
evidence to the grand jury." (*People v. Consago* (1988),
170 Ill. App. 3d 982, 989.) The statements of the other
three men operate to make Potter more culpable for Du-
lin's death on an accountability theory, and do not excul-
pate defendant.

Defendant next contends that his right to the due
process of law was denied when both the court and pros-
ecutor denied his request that Gullion and Gillespie be
immunized. The State maintains that immunity is an ex-
ecutive decision and, in any event, the defendant waived
this issue by not requesting that the witnesses be given
immunity until the trial was over.

In *People v. Sanchez* (1989), 131 Ill. 2d 417, 424, the court held that as a general rule, the judiciary does not have the power to immunize witnesses; rather, the State is statutorily vested with such a power. (Ill. Rev. Stat. 1987, ch. 38, par. 106—1.) Nevertheless, defendant, like the defendant in *Sanchez,* urges this court to follow *Virgin Islands v. Smith* (3d Cir. 1980), 615 F.2d 964, and recognize the concept of judicial immunity.

We find that the facts of this case do not support defendant's judicial immunity argument. As defendant explained, the concept of judicial immunity revolves around the exculpatory nature of the evidence in question. Here, while Gillespie and Gullion saw Potter both before and after her trip to Dulin's home, they were not eyewitnesses to the crime. As we have previously stated, their testimony makes Potter more accountable for Dulin's death and it does not clearly exculpate defendant.

## TRIAL

Defendant initially contends that the State did not prove him guilty beyond a reasonable doubt. Defendant maintains that he was not sufficiently proven guilty because: there was no physical evidence linking him to the crime; Potter and Frye's testimony was incredible; and several witnesses testified to an alibi for both defendant and Frye. On the other hand, the State's position is that defendant essentially challenges the weight and credibility of the testimony of witnesses, a matter it maintains to be within the exclusive province of the jury.

The standard of review on a challenge to the sufficiency of the evidence in a criminal proceeding was recently set forth as follows:

 " 'A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt.' [Citations.] It is not the function of this court to

retry a defendant when considering a challenge to the sufficiency of the evidence. [Citation.] Instead, determination of the weight to be given to witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the fact finder. [Citation.] On review:

> ' "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *** "[O]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through the legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.)' *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789." *People v. Steidl* (1991), 142 Ill. 2d 204, 226.

The critical evidence offered by the prosecution was the testimony of Potter and Frye. As to Potter, defendant contends that she lacked credibility because she was an accomplice, she sold and used drugs, and she also had a record of prior criminal convictions. Moreover, defendant contends that Potter's behavior after Dulin's death, coupled with the many inconsistencies in her testimony, weaken her credibility even further: the murder weapon was hers; Lydia Gullion saw her with a gun after the burglary; while in Troyer's apartment, Troyer testified, she told Gullion that there was a .22-caliber gun in the car; when she entered Troyer's apartment, she put some money on his coffee table and said, "I thought there would be more than two hundred fifty dollars there"; and she attempted to conceal the gun from the police.

However, Potter did testify that Dulin and the defendant struggled with one another. The pathologist testified that the wounds he discovered on Dulin's hands

and fingernails were "consistent with the deceased having attempted to fight with someone." She stated that Dulin grabbed a BB gun and had it knocked from his hands. The crime scene technician recovered what "appeared to be a—the safety off of like a B-B pistol" from a throw rug near Dulin's body. Dulin's daughter testified that her father owned a BB pistol. Potter stated that defendant beat her with a gun at the living room desk. A serologist testified that blood taken from some papers that were located on Dulin's desk "could have originated from Gayle Potter; they could not have originated from William Dulin, Ralph Frye, or Joseph Burrows." Defendant notes that Potter said that she bled very badly, but only a small amount of blood was discovered on the desk. What defendant fails to mention here though is that Potter and Frye each testified that defendant went into the house to wipe things off, and when he returned, he was carrying some papers and other things.

Frye's testimony corroborated Potter's in many respects. Potter and Frye each testified that defendant pulled a gun from his waistband, and after struggling with Dulin, defendant shot him. As defendant points out, any consistency in Potter's and Frye's testimony could be attributed to the fact that they conversed with each other in the county jail. However, their post-arrest statements were consistent in several major respects: that defendant pulled out a gun; that he struggled with Dulin; and shots were fired. Dulin was found with a "through and through" wound to his shoulder and a bullet wound in his head.

The trial judge, in summarizing the incriminating evidence, made the following acute observation at defendant's sentencing hearing:

"THE COURT: The evidence that applied to this defendant when you consider all of it is essentially the testimony of the two co-defendants, the physical evidence

that was gathered in this case and was found seem to all have been found in the presence and in the possession of Gale Potter.

However, you have the overwhelming situation of a young man, Ralph Frye, for whatever reason, being awakened in the early hours of the morning seemingly not having time at that time to fabricate a story putting himself at the murder scene and testifying as to what occurred indicating that it was this defendant who pulled the trigger."

We agree that Frye's post-arrest statement to Iroquois County Investigator George was particularly telling. In that statement, Frye said that five shots were fired inside Dulin's home. The crime scene technician's investigation also revealed that five shots were fired. Moreover, Troyer testified that Gullion, after being told by Potter that there was a .22-caliber gun in the car, left the apartment and returned with "like eight or nine shells *** four or five of them were spent and four or five of them weren't." Although he was not sure of the caliber, Frye stated that the gun was a revolver. Investigator George testified that, at Gillespie's direction, he recovered a nine-shot, .22-caliber revolver from a wooded lot near Gillespie and Potter's trailer. Frye also told the investigator that three shots went into the ceiling. The crime scene technician testified that there were two bullet holes and a deflection mark in the ceiling of Dulin's living room. Frye told the investigator that defendant removed Dulin's pants and picked up a gold money clip. Dulin's daughters each testified that their father owned a gold money clip. Investigator George stated that Frye told him some things that he was not aware of at the time he took his statement: the number of bullet holes in the ceiling; the fact that a gold money clip was taken; and that Dulin's pants had been taken off.

Defendant argues that Frye admitted to making several false statements to the police in his post-arrest statement: that Potter was yelling and screaming at Dulin; that he went to Watseka with Potter and the defendant; that defendant punched Dulin in the head; and that he and the defendant went to an airport to get rid of the truck. Defendant also finds it significant that in Frye's post-arrest statement, he also told the police that defendant had used a .38-caliber gun and that the incident occurred in a hallway. However, in his post-arrest statement, Frye said that the incident occurred in "[t]he hallway and part of the living room area." Frye did not elaborate further as to the presence of a hallway or long corridor within Dulin's home and it is certainly possible that Frye could have used the word "hallway" to describe the entryway into Dulin's home. Moreover, Frye said that the gun defendant used "looked like a .38," but he "couldn't remember what [the caliber] was." After reviewing Frye's post-arrest statement in its entirety, he can hardly be considered someone who was not present at the time the crime occurred.

While Frye did make two statements of recantation between defendant's two trials, this court has held that recantations are inherently unreliable. (*Steidel*, 142 Ill. 2d 204.) The untrustworthy character of Frye's recantations is especially true here. According to Frye, Boyer helped him write the recantation letter and, before Frye gave a tape-recorded recantation statement, Boyer also told him that he would try to represent him and get him out of jail.

Defendant did present some witnesses who tried to establish an alibi for both him and Frye. The gas station employee who testified could not even remember whether she saw defendant on the night of the murder. In addition, Espeland testified that she saw defendant around 8 p.m. on November 6, 1988, but the State's evi-

dence showed that the murder occurred after 8 p.m. Rodgers and Thomas also testified in an attempt to establish an alibi for Frye. Nevertheless, given all the evidence adduced at trial, and reviewing it in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found defendant guilty beyond a reasonable doubt.

Defendant next contends that the testimony of Frye's attorney, Jones, was irrelevant and prejudicial. Defendant concedes that no objection was made as to Jones' testimony, but he urges this court to apply the plain error rule. The State maintains that any error in allowing Jones' testimony has been waived because defendant failed to object at trial.

To properly preserve an issue for review, "a defendant must object to an error at trial and include the objection in a post-trial motion." (*People v. Mullen* (1990), 141 Ill. 2d 394, 401.) An unobjected-to error may nevertheless be considered by a reviewing court under the plain error rule. (134 Ill. 2d R. 615(a).) In accordance with this rule, a court of review can consider a trial error in two limited instances: (1) if the evidence in a criminal case is closely balanced; or (2) if the complained-of error "is so fundamental and of such magnitude that the accused was denied a fair trial." *People v. Herrett* (1990), 137 Ill. 2d 195, 209-10.

Defendant contends that both prongs of the plain error rule have been satisfied because the evidence was closely balanced and the error in admitting Jones' testimony was so substantial that it deprived him of a fair trial. We disagree.

The evidence here cannot reasonably be considered closely balanced. It is true that there was no physical evidence linking defendant to the crime or crime scene. However, a sufficient amount of other evidence was presented which demonstrated that he was guilty of mur-

dering and robbing Dulin. Potter and Frye both testified that they, along with defendant, were present in Dulin's home on the night of November 6, 1988. They each testified in part as follows: that Dulin was asked to make a $3,000 loan; that Dulin stated he did not "have that kind of money" and that Potter should return later in the week; that defendant pulled a gun from inside his waistband; that Dulin struggled with defendant over the gun; and that Dulin was shoved backwards and shot in the head by defendant. Since these two witnesses were involved in Dulin's murder, the jury was instructed to cautiously consider their testimony. (Illinois Pattern Jury Instructions, Criminal, No. 3.17 (2d ed. 1981).) Potter's testimony was particularly suspicious in view of Troyer's testimony about what transpired within his apartment. Moreover, she instructed her boyfriend to conceal the revolver. However, Frye's testimony was very probative of defendant's guilt. Frye considered defendant a friend, a person he had known for approximately 12 to 14 years. He described in detail what occurred in Dulin's home, and that it was the defendant, not Potter, who had shot Dulin.

A second basis upon which to invoke the plain error rule is where the error is so substantial that it deprived defendant of a fair trial. Consequently, it must first be determined whether it was erroneous to admit Jones' testimony and, if it was, then it must be determined whether the error was of such magnitude that it constituted plain error. Jones, Frye's attorney, was the last witness called by the State before it rested its case. He testified that Boyer, defendant's attorney, did not have his permission to communicate with Frye and that he was not present when his client gave a taped statement to Boyer. Defendant contends that Jones' testimony was not probative of the reliability of Frye's recantation statement. However, the State contends that the above

testimony was relevant for the purpose of proving the unreliability of Frye's taped recantation statement.

> "Evidence is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. [Citations.] Relevant evidence is defined as evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *People v. Gonzalez* (1991), 142 Ill. 2d 481, 487-88.

The reliability of Frye's taped recantation statement was certainly at issue in this case. Frye initially gave a post-arrest statement in which he told the police that he was at Dulin's farmhouse on the night of the murder. In his recantation statement, he said that he was never at Dulin's house. Frye was an important witness for the State and defendant sought to discredit him by playing his statement before the jury and then cross-examining him on it.

The fact that Boyer took Frye's statement outside the presence of his attorney and after Jones had told him that he was not permitted to talk to his client does tend to prove that Frye's statement was not taken in a reliable manner. Defendant asserts that "[a] balancing of the probative value versus the prejudicial effect of this evidence suggests that the evidence was inadmissible."

The trial court is responsible for making admissibility determinations after weighing the probative value and prejudicial impact of evidence. Such evidentiary rulings will not be reversed "on appeal unless a clear abuse of discretion is shown." (*Gonzalez*, 142 Ill. 2d at 489.) This court does not find that the prejudicial effect of Jones' testimony substantially outweighed its probative value. Therefore, the trial court did not abuse its discretion in admitting Jones' testimony. Since there was no error in admitting Jones' testimony, the second prong of the

plain error rule need not be applied and defendant's attorney was not ineffective for having failed to object to Jones' testimony.

Defendant next contends that he was denied his right to the effective assistance of counsel when his attorney: (1) cross-examined Jones and elicited statements which were overwhelmingly prejudicial to his defense; (2) cross-examined Potter regarding her motive for testifying; (3) cross-examined Potter on how her gun came into the possession of the defendant; (4) operated under a conflict of interest during the trial; and (5) failed to withdraw from the case in a situation where his attorney's testimony was necessary to his defense.

Claims of ineffective assistance of counsel are reviewed through the application of the *Strickland* test, which is a two-part test that was announced by the Supreme Court and adopted by this court in *People v. Albanese* (1984), 104 Ill. 2d 504, 526.

The test was recently summarized as follows:

> "Ordinarily, to prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's substandard representation so prejudiced the defense as to deny the defendant a fair trial. (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, citing *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) To show actual prejudice, defendant must establish that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068." *People v. Horton* (1991), 143 Ill. 2d 11, 23.

When reviewing the conduct of defense counsel under part one of the *Strickland* test, " 'there is a strong presumption that the challenged action of counsel was the

product of sound trial strategy and not of incompetence.' " (*Steidel*, 142 Ill. 2d at 240, quoting *People v. Barrow* (1989), 133 Ill. 2d 226, 247.) Nevertheless, when a reviewing court addresses an ineffective-assistance-of-counsel claim, it need not apply the two-part test in numerical order. " '[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' [*Strickland*] 466 U.S. 668, 697, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069-70." *Albanese*, 104 Ill. 2d at 527.

Defendant's first ineffectiveness claim is based on the following colloquy between defense counsel and Jones during the cross-examination and re-cross-examination:

"Q. [Defense attorney]: Okay. Now, Mr. Jones, you indicated that you forbid my talking to Ralph Frye. Did you also forbid the Prosecutor from talking to Ralph Frye?

A. [Jones]: No.

Q. Would you tell us, please—I hate to ask this question. Tell us why you didn't want me talking to Ralph Frye but you let the Prosecutor talk to Ralph Frye?

A. If you insist. I am an attorney at law retained to represent Ralph Frye. It is my job and I get paid to decide what is in Ralph's best interests. I happen to know with respect to the original crime that Ralph was there.

MR. BOYER: Judge, I object and ask that it be stricken.

THE COURT: Same is stricken. The Jury is to disregard it.

A. Let's put it this way. I determined long ago that the best course of action for my client would be the truth. I have consistently advised him to tell the truth. I greatly feared that if you spoke to him, knowing what a vulnerable state Ralph is in now, that you would do exactly what you did do. Namely get him to say something

else. And I don't think that that is in his best interests. Especially since he still awaits sentencing. I think it is in his best interests to be honest and to tell the truth and I was afraid he would be twisted around and manipulated.

\* \* \*

Q. And is it fair to say that your opinion was that if Ralph started saying that he was not present when Mr. Dulin was killed that the Prosecutor might recommend a greater sentence then he would otherwise?

A. I have no idea whatsoever what the Prosecutor will recommend. I am concerned on behalf of my client how he appears before the bar. I realize it's a novel approach, but I think the best thing for him to do is to tell the truth and that he will look the best before sentencing for doing so.

\* \* \*

Q. But in any event, you don't know—you don't have—other than what Ralph told you, you have no information for this jury that I deceived, I misled or I made false representations of any kind to Ralph?

A. I only know that Ralph told me you promised to get him out of jail if he would give that statement."

Defendant maintains that counsel's "[o]pening the door to this testimony constituted \* \* \* ineffective assistance [and] [t]here can be no strategic reason why defense counsel, who built his entire case around proving that Ralph Frye was a liar, would elicit Frye's attorney's testimony that he knew Frye was at the scene of the crime, and that Frye had told the truth on the witness stand." The State, on the other hand, asserts that defense counsel's questions were part of his trial strategy to show that Jones advised Frye to cooperate with the prosecution in order to obtain a favorable sentence. The State concludes that the unfavorable answers "cannot be blamed on the defense counsel."

After reviewing the record, we find that defendant has failed to overcome the presumption that defense counsel's questions were the product of sound trial strat-

egy. It is clear that defense counsel had to attack Frye's credibility. As defendant notes in his reply brief, "the defense was attempting to [show] that Frye was testifying against Joe Burrows because of some expectation of favorable sentencing treatment \*\*\*." Defense counsel asked the aforementioned questions of Jones with the expectation that Jones would testify that his client was cooperating with the State because he hoped to obtain a lenient prison sentence. The fact that Jones' responses proved unfavorable to his client's defense does not then automatically render the cross-examination inconsistent with his overall strategy.

Defendant also contends that he was denied the right to the effective assistance of counsel when his attorney elicited testimony from Potter concerning her motive for testifying. Defendant believes "[t]here certainly can be no strategic reason why counsel would want to bring this information out." However, the State believes that defense counsel's cross-examination of Potter was a strategic move aimed at showing that her reason for testifying was false and that the jury should then consider her testimony against the defendant to be false also.

The principal part of defense counsel's cross-examination that defendant complains of is as follows:

"Q. [Defense attorney]: I see. Miss Potter, I have a few more questions. You just mentioned that—today during your testimony that one reason you're testifying here is because of your friend Mr. Dulin, another reason now is you wanted to tell the truth, that you weren't expecting any leniency or anything else from your testimony, that you weren't expecting to walk out of her [sic], and you also testified that someone in your family got hurt?

A. [Potter]: Yes.

Q. And I think you mentioned a nephew?

A. Yes.

Q. And you want us to believe, do you not, that Mr. Burrows had something to do with your nephew getting hurt?

A. Yes.

* * *

Q. Thank you, Judge. And your nephew's boy was molested in some fashion?

A. No.

Q. He was abused?

A. Not my nephew's boy, no, sir.

Q. Oh, I'm sorry, I misspoke. Your nephew, was he abused?

A. Yes, he was.

Q. Sexually molested?

A. Yes, he was.

Q. That's what you have been told?

A. Yes.

Q. And you have been—of course, you have been in the Iroquois County Jail since November 8th, 1988?

A. I saw the medical report.

Q. And isn't it true, Miss Potter, that there was a person arrested for doing that to that boy?

A. Yes.

Q. And was his name David Wachtel—W-A-C-H-T-E-L?

A. No.

Q. What was his name?

A. David Wachtel.

Q. W-E-C-H-T-E-L?

A. W-A-C-H-T-E-L.

Q. He was incarcerated in the Champaign County Jail for doing that to your nephew?

A. He was charged with it and convicted and has it on appeal.

Q. And he was convicted of it. Do you want to tell this jury who that man is?

A. He was my sister's live-in boyfriend. He was afraid to tell—

Q. And you're blaming Joe [B]urrows, Miss Potter?

A. He was afraid to tell the Judge because my sister's life had also been threatened.

Q. He's been convicted of it, is that correct?

A. Yes, he was.

Q. Before a jury?

A. No, sir, he didn't go before a jury.

Q. And it's up on appeal?

A. Yes, it is.

Q. And you want this jury to believe that Joe Burrows or someone for Joe Burrows did that to him, is that correct?

A. Yes.

Q. And that's why you decided to finally tell the truth?

A. Yes."

We find that defense counsel's questions on cross-examination were asked for the strategic purpose of attacking Potter's credibility. As the State correctly noted in its brief, by showing that defendant's responsibility for the molestation of her nephew was groundless, defense counsel wanted the jury to view her entire story about defendant's involvement in Dulin's murder as incredible too. This sound trial strategy was made evident in a segment of defense counsel's closing argument: "She wants you to believe—and this to me was good— she even wants you to believe that Joe Burrows had something to do with the molestation of her nephew. Yeah. And when we know that her sister's live-in boyfriend was found guilty of doing that. I mean that is how far this young lady is going with regard to this case."

Defendant contends that he was also denied the right to the effective assistance of counsel when his attorney cross-examined Potter and elicited hearsay statements from her about the person who allegedly stole the gun from her trailer. The part of the cross-examination that defendant complains of is as follows:

"Q. [Defense attorney]: Now, so, you owned the murder weapon before the killing of Mr. Dulin, is that correct?

A. [Potter]: Yes.

Q. Your weapon killed Mr. Dulin, is that correct?

A. Yes.

Q. And it ended up in your trailer after the murder is that correct?

A. Yes.

Q. But now you are telling us that Mr.—my client, Joe Burrows, used your weapon to shoot Mr. Dulin?

A. Yes, he did.

Q. And tell us again how he got a hold of the weapon?

A. His brother, Charles Burrows, broke into the trailer.

Q. How do you know that?

A. Because Charles Burrows admitted it to several people.

Q. How do you know that?

A. Because they told me so.

MR. BOYER [Defense attorney]: Judge, I ask that that all be stricken.

MR. BRASEL [Special prosecutor]: Your Honor, I think it's got to stand. He asked a question and I think he's got to stand with the answer.

THE COURT: Answer will stand.

Q. So, people have told you that Mr. Charles Burrows broke into the trailer is that correct?

A. Yes."

As to the above testimony, defendant "strenuously disputes that this evidence was brought out in any strategic fashion," whereas the State contends it was sound trial strategy to "commit[ ] Potter to the burglary explanation so that she could be impeached with the testimony of Lydia Gullion and Terry Reed." We agree with the State and find that the above questions were asked as part of defense counsel's sound trial strategy to discredit Potter.

Not only did defense counsel desire to impeach Potter through the testimony of Lydia Gullion and Reed, but he wanted to emphasize for the jury what he considered to be her preposterous explanation of how defendant obtained her gun to kill Dulin. Again, this strategy was made evident in a segment of defense counsel's closing argument:

"If what happened regarding her explanation of this gun isn't enough to convict her, I don't know what is. Let me tell you what I'm talking about. She never told the Sheriff in the taped statement that this was her gun. They find the gun, however, on November 17th back of her trailer. Okay? Outside her trailer by the water heater. You have seen the picture of that. How does she explain that? How in the world, if this is her gun and it's at her residence after the murder, how does she explain that Joe Burrows used that gun to shoot Mr. Dulin? Well, she says that her gun got stolen in a burglary. And she—she said that Joe's brother did the burglary. Pretty nifty. Okay? And she says that when—by chance when the three of them were in Mr. Dulin's house that Joe pulls her gun that was stolen out of a burglary out of his pants and he shoots Mr. Dulin with it. Boy what a story. What a coincidence. Amazing coincidence. Amazing. Her gun gets stolen in a burglary. My client ends up with it and it is used to shoot a man whe[n] she's present. Amazing. Amazing coincidence. Amazing. But then how does—why does the gun end up at her—her trailer afterward? No problem for Gayle. Joe Burrows after she shoots the old man with her gun, Joe plants it in her car. Yeah. Joe plants it in her car. Ladies and Gentlemen, if there is a single person in this courtroom that believes that story I have got a bridge in Brooklyn, I've got—I've got ocean front property in Arizona and I would like to make some money. I can't understand how the Prosecutor could present that type of evidence to you and expect you to believe it."

Defendant also contends that he was denied the right to the effective assistance of counsel because his inter-

ests allegedly conflicted with the interests of his attorney. The State maintains that defendant has failed to identify how his attorney was committed to someone other than his client.

> "The right to effective assistance of counsel is a fundamental right and entitles the person represented to the undivided loyalty of counsel. [Citations.] This court held in *People v. Stoval* (1968), 40 Ill. 2d 109, 112, that allegations and proof of prejudice are unnecessary in cases when defense counsel, without the knowledgeable assent of the defendant, might not have an undivided loyalty to his client because of his commitments to others. [Citation.] There was no showing in *Stoval* that the attorney had not properly conducted the defense of the accused, but this court determined that sound public policy required representation free from conflicts of interest. If a conflict of interest 'in the form of conflicting professional commitments is shown, defendant need not demonstrate any prejudice to justify reversal.' [Citations.] The defendant, however, must show the attorney has a contemporaneous conflicting professional commitment to another." *People v. Hillenbrand* (1988), 121 Ill. 2d 537, 544.

The critical inquiry here is whether a conflict existed between defendant and his attorney because, if no conflict is found, defendant's right to the effective assistance of counsel was not jeopardized. (*People v. Berland* (1978), 74 Ill. 2d 286, 305.) Defendant asks this court to speculate whether his attorney's "personal and professional concerns" arising out of his communications with Frye conflicted with his duty to represent him with undivided loyalty. We have reviewed the record and find that no actual conflict of interest manifested at trial.

Defendant's assertion that his attorney labored under a conflict due to his "professional concerns regarding the recantation evidence" is speculative and does not amount to a conflict of interest. (*People v. Robinson* (1979), 79 Ill. 2d 147, 169.) Moreover, the record does

not support defendant's argument. If anything, the record shows that defense counsel was not concerned, because he made the following comments before the court:

> "MR. BOYER [Defense attorney]: I looked—I ask the Court to look at the Code of Professional Responsibilities and there is nothing in there which prohibits me from talking to a witness whether he is represented by Counsel or not. If Ralph Frye were an adversary, if he were a party to this particular proceeding and he was represented by Counsel, I couldn't talk to him obviously. But he is not a party to this proceeding. He is only a witness in this proceeding against Joe Burrows. And the code does not prohibit in any way my talking to him, Judge."

See also *People v. Lawson* (1980), 86 Ill. App. 3d 376, 405-08 (defendant was not denied his right to the effective assistance of counsel in that no conflict of interest was found where a witness accused defense counsel of suborning perjury).

Defendant next contends that his attorney violated Disciplinary Rule 5—102(a) of the Code of Professional Responsibility (the Code) (107 Ill. 2d R. 5—102(a)) (the Code was repealed effective August 1, 1990, by order entered February 8, 1990, and replaced by the Illinois Rules of Professional Conduct (134 Ill. 2d R. 1.1 *et seq.*)); that due to the violation, he was denied the right to the effective assistance of counsel because his attorney ought to have testified on his behalf and explained the trustworthy circumstances surrounding Frye's recantation statements; and because he failed to testify, the jury, according to the defendant, was left with the conclusion "that the statement had been coerced or tricked out of Frye." The State insists that defense counsel's failure to withdraw did not harm the defendant because any testimony he could have given would have been unfavorable to his client's case.

To determine whether defense counsel's conduct fell below an objective standard of reasonableness, it is necessary to review the record carefully to determine whether defendant's attorney, by not withdrawing as counsel, was in violation of Rule 5—102(a). Prior to trial, the special prosecutor, Tony Brasel, filed a motion *in limine* wherein he requested that the defense not be permitted to use Frye's recantation statements. In his written motion, the prosecutor maintained that the statements "were obtained improperly and in a highly coercive and prejudicial manner." Brasel advised the court that he thought it was proper to raise the motion prior to trial "[b]ecause there are some factual allegations and, unfortunately, Mr. Boyer [defense attorney] is involved in some of those factual allegations—and the reason I am bringing it up at this time before the trial starts is that it is possible that Mr. Boyer and Mr. Thompson [Boyer's partner] at some time might feel they have to take the stand in this case."

Immediately thereafter, the following dialogue transpired between Boyer, Brasel, and the court:

"MR. BRASEL [Special prosecutor]: According to my conversation with him [Frye] last time, hopefully it won't change. But he is making allegations that Mr. Boyer told him certain things about getting out of jail, about his statement that it should have been suppressed and other things that I mention in the motion. And I don't know what—whether Mr. Boyer is going to admit that he said those things or whether he is going to deny that. If he does deny that, the only way I understand that he is going to be able to do that is—if Ralph doesn't admit that he is not telling the truth—is for him to take the stand. So I thought before we get involved in this case asfaras [*sic*] picking a jury—obviously Mr. Boyer cannot be a witness in this case and also represent Mr. Burrows. So I think we need to get that matter taken care of or resolved before we proceed with jury selection in this case.

\* \* \*

MR. BOYER [Defense attorney]: *I am going to ac-knowledge that there is a strong possibility that I could be a witness in this case. And most certainly Mr. Thompson, my law partner, will have to be a witness in the case.*

THE COURT: O[n] this? On this aspect of it?

MR. BOYER: Because of the fact that *he* was present when a statement was taken from Mr. Frye." (Emphasis added.)

The record shows that Thompson *and* Boyer were the only persons present when Frye gave a tape-recorded re-cantation statement.

Rule 5—102(a) of the Code provides:

"If a lawyer learns after undertaking employment in contemplated or pending litigation or if it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the con-duct of the trial and neither he nor his firm, if any, shall continue representation at trial, except that he may con-tinue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in Rules 5—101(b)(1) through (b)(4)." 107 Ill. 2d R. 5—102(a).

Where an attorney or another member of his firm "ought" to testify on behalf of a client, the attorney must withdraw unless the circumstances pertaining to the attorney's intended testimony fall under one of the following four exceptions listed in Rule 5—101(b):

"A lawyer \* \* \* or a lawyer in his firm may testify

(1) if the testimony will relate solely to an uncon-tested matter;

(2) if the testimony will relate solely to a matter of formality and there is no reason to believe that substan-tial evidence will be offered in opposition to the testi-mony;

(3) if the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client; or

(4) as to any other matter, if refusal to accept the employment would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case." 107 Ill. 2d Rules 5—101(b)(1) through (b)(4).

Given Boyer's admission on the record, that there was a strong possibility that he would be a witness and that his partner was certainly going to be a witness, the court should have determined prior to trial whether either one of them "ought to be called as a witness on behalf" of the defendant. (107 Ill. 2d R. 5—102(a).) If the answer to this question was in the affirmative, then the only possible way he or his firm could have continued to represent the defendant was if one of the four exceptions under Rule 5—101(b) applied. However, Boyer never sought to withdraw and the record is unclear as to whether the court correctly analyzed the necessity of Boyer's or Thompson's testimony within the framework of Rule 5—102(a).

The court considered it wise to question Frye about the recantation statements. Frye gave the following answers to the court's questions:

"Q. [Court]: Did you have some conversation about all this with Mr. Boyer or Mr. Thompson before you made the statement?

A. [Frye]: Yes, I did. They told me—Mr. Boyer told me that he would—if I kept to this statement, that he would help me get out of jail. Me and Joe Burrows.

* * *

Q. All right. Did you have any conversation after that?

A. Yes, we did.

Q. Tell me what that was about?

A. Well, Mr. Boyer told me that I was the one that was putting Joseph Burrows in the chair. And told me that, you know, if I didn't turn my statement around that

me and Joe Burrows were going to prison for a very long time.

* * *

Q. Did Mr. Boyer in any way promise you anything? I mean, did he promise you he would get you out of jail or that he was going to get you some deal on your charges?

A. Well, he promised that if I would have stuck with my statement that he would see that me—he would try to keep me and Joe Burrows and try to get us out of jail if I would have stuck with the alibi, with the taped statement."

The court denied the State's motion *in limine* and found that it would not be necessary for either Boyer or Thompson to testify because Frye admitted to making the taped recantation statement. However, the circumstances surrounding Frye's recantation statements appear to be in dispute. See, *e.g.*, Alabama Ethics Opinion 801:1103 (ABA/BNA 1986) ("A lawyer must withdraw from representation of a client accused of raping his daughter where the lawyer is likely to be called to testify as to a tape-recorded statement he obtained from the daughter in which she admitted that the client had never raped her. In this case, * * * the lawyer will be cross-examined about the circumstances surrounding his obtaining the tape recording").

After examining the record, it is clear that Boyer ought to have testified on behalf of the defendant. Frye's in-court testimony and his post-arrest statement were crucial to the State's case. On cross-examination, Boyer attacked Frye's credibility by introducing his recantation letter and his taped recantation statement. However, as it had warned Boyer and the court earlier, the State attacked the probative value of Frye's recantation statements during Frye's redirect examination. Frye's testimony on redirect examination included the following: that Boyer said he would try to represent him

and get him out of jail if he wrote a recantation letter to the judge who was to preside over defendant's trial; that Boyer and Thompson told him how to write the letter— "like the medication, how it came about on November 6th, what happened on that date and how I took—I came about to the doctor and the stomach cramps, things like that"; that Boyer told him that if he stuck to the taped recantation statement he would try to represent him and get him out of jail; that Boyer told him that his defense attorney was incompetent and he should seek new counsel; and that Boyer put a guilt trip on him by telling him he was putting someone he knew for a long time, Burrows, in the electric chair. Boyer and his partner, Thompson, were the only persons present when Frye gave his taped recantation statement.

At various places within the record, Boyer made the following statements with regard to his involvement with Frye: that he denied making some of the statements that Frye testified to; that he never promised Frye anything; that he never contacted Frye; that Frye misrepresented what happened; and that nothing was said to Frye about certain benefits that could be derived from giving the taped statement. Boyer and Thompson ought to have testified to the factual circumstances pertaining to Frye's recantation statements. See generally *United States ex rel. Sheldon Electric Co. v. Blackhawk Heating & Plumbing Co.* (S.D.N.Y. 1976), 423 F. Supp. 486, 488 (attorney ought to be called as a witness where he "possesses knowledge crucial to a determination of whether the Release was executed under circumstances constituting economic duress"); *J.P. Foley & Co. v. Vanderbilt* (2d Cir. 1975), 523 F.2d 1357, 1359 (attorney ought to be called as a witness where "his testimony is necessary"); *United States v. Vereen* (D.C. Cir. 1970), 429 F.2d 713, 715 (court erred in refusing to permit the testimony of an attorney where the victim told the attor-

ney a conflicting story before trial). But see *Cox v. State* (Ind. 1985), 475 N.E.2d 664, 674 (attorney ought not testify where his testimony would have been cumulative).

We find that defense counsel's failure to withdraw in order to give testimony relative to the circumstances surrounding the recantation statements cannot be considered sound trial strategy. Boyer and Thompson appear to be the only persons who can rebut Frye's testimony that the recantation statements were coercively obtained. Therefore, Boyer's conduct " 'fell below an objective standard of reasonableness' (*Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064) and caused a breakdown in the adversarial process (*Strickland*, 466 U.S. at 688-90, 80 L. Ed. 2d at 693-95, 104 S. Ct. at 2064-66)." *People v. Bean* (1990), 137 Ill. 2d 65, 130.[1]

Nevertheless, to prevail on an ineffective-assistance claim, the defendant must also prove the second part of the *Strickland* test: that the deficient representation of his defense counsel prejudiced his cause because "there was a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.)" (*Bean*, 137 Ill. 2d at 130.) "[D]efendant has to prove a 'reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' " (*Bean*, 137

---

[1]Any need for Boyer or Thompson's testimony could have been avoided. See Standard for Criminal Justice 4—4.3(d) ("Unless the lawyer for the accused is prepared to forgo impeachment of a witness by the lawyer's own testimony as to what the witness stated in an interview or to seek leave to withdraw from the case in order to present such impeaching testimony, the lawyer should avoid interviewing a prospective witness except in the presence of a third person").

Ill. 2d at 130.) Defendant has not sufficiently shown that, had his attorney testified, a reasonable probability exists that the outcome of his trial would have been different.

The record simply does not establish what Boyer's testimony would have been had he been called to the stand. Although Boyer did deny making any promises to Frye, it is not altogether clear that Boyer obtained Frye's statements in the reliable and trustworthy manner that defendant suggests. This is evident in the following colloquy between Boyer and Frye:

"A. [Frye]: *** Didn't you tell me that you could also get me out of jail if I had stuck to this taped statement?

Q. [Boyer]: Ralph, there is no question to you right now.

A. Well, I'm handing you one.

Q. To answer your question, I told you that I would try.

A. No, you didn't tell me that, you said you would if I stuck to the taped statement.

Q. Okay."

The court provided Boyer an opportunity to make a statement in allocution, but Boyer declined to do so. Because the record does not adequately set forth what Boyer's testimony would have been, we cannot resolve this ineffectiveness claim in defendant's favor. See *State v. Angle* (Iowa 1984), 353 N.W.2d 421 (court did not resolve ineffective-assistance claim in defendant's favor where he did not establish that his counsel's testimony would have been different from testimony of the State's witnesses); *United States ex rel. Moore v. Peters* (N.D. Ill. Nov. 3, 1989), No. 89—C—3970 (defendant did not demonstrate that outcome of trial would have been different had attorney testified where there was no evidence to suggest that such testimony would have contradicted the police officer's testimony); *Alford v. State*

(1987), 291 Ark. 243, 724 S.W.2d 151 (counsel was not ineffective in not testifying in defendant's behalf where it was not demonstrated that his testimony would have created a reasonable probability that jury would have reached a different verdict).

Defendant next contends that the court gave a *sua sponte* jury instruction which improperly diluted the evidence he presented relative to Frye's motive for testifying. According to the defendant, this instruction infringed upon his right to a fair trial, his right to confront witnesses, and his due process rights. The State maintains that the court made a comment, not an instruction, and that it was not reversible error to make such a comment.

After defense counsel finished with his cross-examination of Jones, and immediately before the defense rested its case, the court addressed the jury as follows:

"THE COURT: Members of the Jury, when a person pleads guilty or is convicted of a crime it is the duty of the Court to impose a sentence upon him. There are certain standards for sentencing. There are certain rules having to do with what we call disparity of sentencing. It has to do with similar people convicted of the similar crime—of the same crime having to do with the sentence that is imposed upon people who are involved in the same crime. In order to avoid a disparity of sentencing situation, I made it clear to the Attorneys involved that I would do all of the sentencings when all of these Defendants were completed. That is the origin of this whole thing that seems to be a great problem for everybody. It was merely the fact that when this whole case was completed, I would then take the sentencing because then I would know what everybody's status was insofaras [*sic*] this case is concerned."

The defense tried to establish that there was a causal link between the delay in Frye's sentencing hearing and Frye's testimony in defendant's trial. In its remarks to

the jury, the court commented that it was entrusted with the duty to impose sentences and that any sentences would be imposed only after the trials of each of the three defendants were completed. The judge wanted to inform the jury that any delay in sentencing was done to avoid any disparate sentencing problems, and that the issue of disparity could only be addressed when the status of each of the defendants was known at the conclusion of their respective trials. The court wanted the jury to understand that Frye's sentencing hearing was not delayed for the purpose of giving him an opportunity to testify on behalf of the State.

The trial court is entrusted with the duty to see that all persons are given a fair trial. (*People v. Lewerenz* (1962), 24 Ill. 2d 295, 301.) Trial judges must take care to insure that their intimations, demeanor, and comments do not prejudice those against whom they are made. (*People v. Egan* (1928), 331 Ill. 489, 493.) Judicial comments can amount to reversible error if the defendant can establish that such comments were "a material factor in the conviction or were such that an effect on the jury's verdict was the probable result." (*People v. Harris* (1988), 123 Ill. 2d 113, 137.) We find that the court's comment cannot be considered a material factor in defendant's conviction, and that it is not probable that it affected the jury's verdict.

There is no doubt that the court's comments could have been more narrowly tailored to achieve its purpose. If a portion of the judge's remarks can be taken out of context, it could be argued he gave the jury the impression that defendant was guilty and would eventually be sentenced. However, looking at the comment in its entirety, the court's remarks went more towards the scheduling of Frye's sentencing hearing and that the hearing was not contingent upon his testimony at defendant's trial.

Moreover, we find that the court's comment did not interfere with defendant's confrontational rights. Defendant's strategy was to show that Frye was not at the crime scene and that, since he was already convicted and awaiting sentencing, Frye testified hoping to receive a lesser sentence. The defense was able to pursue its strategy on cross-examination and attack Frye's credibility. This was evident in a segment of defense counsel's closing argument:

> "[Defense attorney]: So why does Ralph say he was there ·when he wasn't? Because he's scared to death of the sentence that he's going to receive out of this. Because if he crosses Mr. Brasel, Mr. Brasel can recommend life. Remember, that is what Ralphy said, okay? And he's in a tight spot. He's in a tight spot."

Defendant next contends that the prosecution made a number of improper remarks during closing argument which denied him his right to a fair trial and his right to the due process of law. We will address only the following prosecutorial remarks, because the others were not properly preserved for review: (1) the prosecutor's use of a chart in which his attorney was allegedly depicted as being "involved" in the case; and (2) the prosecutor's rhetorical question as to the whereabouts of defendant's alibi witnesses.

We decline to review the other remarks under the plain error rule. It has been said time and time again that "[t]o preserve an issue for review '[b]oth a trial objection *and* a written post-trial motion raising the issue are required.'" (Emphasis in original.) (*Steidl*, 142 Ill. 2d at 235, quoting *People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Moreover, we find that the remarks, which were not properly preserved for review, did not operate to deprive the defendant of the effective assistance of counsel. Defendant has not established that the com-

ments prejudiced him to the extent required under part two of the *Strickland* test.

Defendant, citing *People v. Emerson* (1983), 97 Ill. 2d 487, maintains that the prosecutor's use of a chart during closing argument suggested that defense counsel played a role in the case and, thus, the attention of the jury was improperly shifted from the proper evidence presented at trial to the conduct of defense counsel. The State, on the other hand, believes that the chart was a proper piece of demonstrative evidence which showed the jury "how the many names in the evidence fit together: the defendant's sister Debbie convinced Frye's sister Kim that Frye could get out of jail if he contacted defendant's lawyer Boyer, etc."

Courts look favorably upon the use of demonstrative evidence, because it helps the jury understand the issues raised at trial. "The overriding considerations in admitting demonstrative evidence are relevancy and fairness. [Citations.] The question of the admissibility of such exhibits is a matter within the trial court's discretion and will be disturbed only on a showing of clear abuse." (*Burke v. Toledo, Peoria & Western R.R. Co.* (1986), 148 Ill. App. 3d 208, 213.) Defendant has failed to demonstrate that the use of Boyer's name on the chart was clearly irrelevant and unfair given the facts presented at trial.

Drawn on the right-hand side of the chart was an arrow leading from Frye's name to Boyer's name. It is clear that Boyer's name was displayed for the purpose of showing his involvement with Frye relative to Frye's decision to give recantation statements. The evidence at trial established that Frye communicated with Boyer on each of his recantation statements.

Defendant also contends that he was denied a fair trial when the prosecutor asked about the whereabouts of an alibi witness, Murray Kellems. Defendant main-

tains that the prosecutor's question relative to the absence of an alibi witness improperly shifted the burden of proof, in that it implied to the jury that the defendant failed to present exculpatory evidence. The State, although noting that it was one of two remarks which were properly preserved for review, has not squarely responded to defendant's argument in its brief.

The prosecutorial remark was made during the following segment of the State's rebuttal argument:

"[Special prosecutor]: Mr. Boyer talked about Joanne Espeland and we heard her testimony, her talk about what day they left. And I think there was some confusion, Bob George talking to her the second time obtained what he thought to be different information. But you remember Joanne. Even if you believe her, she said that Joe Burrows left on several occasions during that time. She was occupied doing other things. There is nothing to say he couldn't have gone to Champaign and come back. You do recall that Ralph Frye says he did leave the station for a time and they left and then about an hour later Mr. Burrows came back and picked him up. Ralph said that about Joe and also talked about Murray. And I believe Mr. Boyer said Kellum [sic] and she [Joanne Espeland] said Kellam [sic]. Where is Murray [Kellems] at?

MR. BOYER [Defense attorney]: Objection.

THE COURT: Objection sustained.

* * *

MR. BRASEL [Special prosecutor]: I did some research on this and I looked at *People versus Kubat* ***. If it is brought up by Defense witnesses then we are allowed to comment on that." (Emphasis in original.)

In *People v. Kubat* (1983), 94 Ill. 2d 437, 498, the court held "that where a defendant injects into the case the name of an alibi witness and then fails to call the witness, the prosecutor may legitimately comment on the lack of such evidence although it may not be relied upon as proof of the charge." After reviewing the record, we find that Joanne Espeland, a defense witness,

injected the name of Murray Kellems into the case. Therefore, the prosecutor's comment as to Kellems' absence was not improper.

Defendant next contends that the court erred in admitting into evidence the entire transcript of Potter's testimony from Frye's trial because it constituted a prior consistent statement which was inadmissible and extremely prejudicial. The State maintains that defendant has waived any claim of error arising out of the admission of Potter's previous testimony because it was not raised in a post-trial motion. Defendant acknowledges that no mention of Potter's transcript was included in a post-trial motion, but he urges the court to apply the plain error rule. Alternatively, he contends that he was denied the effective assistance of counsel because his attorney failed to include the error of admitting Potter's transcript in a post-trial motion. We decline to invoke the plain error rule under the circumstances here. Therefore, we will not review the admissibility of Potter's transcript. Moreover, defendant has not established that the outcome of his trial would have been different had the transcript not been admitted.

## SENTENCING

Defendant next contends that he is entitled to a new sentencing hearing because the court considered only one mitigating factor—the fact that defendant had a family. Defendant maintains that the court erred because it ignored other mitigating factors which were contained in a voluminous presentence report. (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869.) The State asserts that the court made no such finding and that "[t]here is nothing in the record to suggest that the court refused to consider the defendant's family and psychological history." In reply, defendant believes it to be unlikely that in light of the court's comments at sen-

tencing, it adequately considered the mitigating factors contained within the presentence report. We have reviewed the record and find that the court considered the presentence report and the mitigating evidence contained therein.

The trial judge stated on the record that he "looked at the Pre-sentence Report." He also advised the parties that he "read those reports that were attached to the orange Pre-sentence Investigation." The only records he did not review, and defendant does not complain of this, were those "from the Department of Corrections." The court reasoned that "they infer things such as someone not jumping as soon as one is told to jump by a guard and so on *** and [it] didn't want to get into that in considering any kind of a sentence to impose in this case." The court considered the mitigating factors listed in section 5—5—3.1 of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.1). The court also reviewed the record in light of the five mitigating factors contained in section 9—1(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(c)(1) through (c)(5)). The court then summarized its findings as follows:

> "THE COURT: The Court in looking at those mitigating factors and considering the fact that this defendant does have a family, the Court having considered the defendant's prior records finds there are no mitigating factors that preclude the imposition of the death penalty."

Defendant maintains that the court's reference to "prior records" above could have been a reference to his criminal record, which he contends shows that it did not consider the presentence report. We find that a more reasonable reading of this paragraph indicates that the court was referring to the mitigating evidence contained in the records that were included along with the presen-

tence report. This is the most logical interpretation, especially when one considers the language in section 9—1(h): "If the Court determines that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the Court shall sentence the defendant to death." Ill. Rev. Stat. 1987, ch. 38, par. 9—1(h).

Defendant also cites *Smith v. McCormick* (9th Cir. 1990), 914 F.2d 1153, as support for his claim that the mitigating evidence was not considered and given effect. We find *Smith* to be inapplicable to the instant case. In *Smith*, the court failed to weigh all the mitigating evidence together. There is no evidence within the record of that occurring here.

The presentence report, together with other background records, was well over 1,000 pages long. With the exception of the records from the Department of Corrections, the court stated that it read all the other reports. While the court mentioned that it considered the fact that the defendant had a family, this certainly cannot be understood to mean that this was the only factor it considered. We find that the court considered the defendant's family and psychological history.

Defendant next contends that he is entitled to a new sentencing hearing because the court incorrectly found him eligible for the death penalty. The State maintains that the court did not simply consider the defendant eligible for the death penalty by virtue of the guilty verdicts returned by the jury.

The issue here is whether the court made an independent finding that the defendant was eligible for the death penalty as required by section 9—1 of the Criminal Code. (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(f), (h).) Defendant emphasizes the following passage in the record of the sentencing hearing:

"MR. BRASEL [Special prosecutor]: Your Honor, I'd also move at this time to ask the Court to take judicial

notice of the prior trial that was held in this matter to show the existence of an aggravating factor pursuant to statute.

MR. BOYER [Defense attorney]: Well, Judge, it's my understanding, and I may be mistaken, but it's my understanding that this is all one trial. I guess I can't object to that.

THE COURT: The Court's aware of the fact that the jury found the defendant guilty of murder in the course of an armed robbery and that the aggravating factors theorized [*sic*] the State to seek the death penalty. Having completed all that, we're now ready to go to the sentencing procedure. If you're prepared?"

After considering this statement of the court and reviewing the record of the entire sentencing hearing, we disagree with defendant's contention that the court found defendant eligible for the death penalty merely because the jury convicted him of murder and armed robbery. As the State correctly points out, the record shows that defendant requested that the sentencing hearing not be bifurcated into an eligibility phase and a mitigation phase. Near the end of the hearing, defendant was permitted to make a statement and, shortly thereafter, the court independently reviewed the incriminating evidence against the defendant. The court considered the evidence to be "essentially the testimony of the two co-defendants." The court then analyzed the weaknesses in Potter's testimony and the strength of Frye's post-arrest statement. The court made the following finding:

"THE COURT: The State has proven beyond a reasonable doubt the existence of the aggravating factors."

Defendant next contends that the double jeopardy provision prohibited a death penalty hearing in his second trial because his first trial resulted in a mistrial due to the jury's inability to reach a verdict. Therefore, defendant, relying primarily on *Poland v. Arizona* (1986), 476 U.S. 147, 90 L. Ed. 2d 123, 106 S. Ct. 1749,

and *Bullington v. Missouri* (1981), 451 U.S. 430, 68 L. Ed. 2d 270, 101 S. Ct. 1852, argues that "[t]he jury in the first trial, which *could have been the sentencing jury,* implicitly acquitted him of the death penalty when at least one of its members voted to acquit." (Emphasis added.) The State maintains that the jury in the first trial failed to reach a verdict, and consequently no sentencing jury acquitted the defendant of the death penalty.

In *Poland,* a sentencing judge found that one of the two aggravating factors presented outweighed the mitigating evidence and, as a result, a death sentence was imposed. The Arizona Supreme Court found the evidence insufficient regarding the single aggravating factor which the trial judge relied upon and, with respect to the other factor which the judge found not to be present, the court found that it was present, but that the sentencing judge misunderstood the law. Defendants were retried, convicted, and again sentenced to death. After an unsuccessful appeal to the Arizona Supreme Court, defendant appealed to the United States Supreme Court and argued that the State supreme court's finding, that one of the aggravating factors was not supported by the evidence, was equivalent to an acquittal of the death penalty.

After reviewing its earlier decisions, the Court stated that "the relevant inquiry *** is whether the sentencing judge *** has 'decid[ed] that the prosecution has not proved its case' for the death penalty and hence has 'acquitted' petitioners." (*Poland,* 476 U.S. at 154, 90 L. Ed. 2d at 131, 106 S. Ct. at 1754, quoting *Bullington,* 451 U.S. at 443, 68 L. Ed. 2d at 282, 101 S. Ct. at 1860.) There was no death-penalty acquittal under the facts here; hence, double jeopardy did not preclude the State from seeking the death penalty at defendant's second trial.

As defendant plainly concedes, no sentencing hearing took place at the conclusion of his first trial because a mistrial was declared. Obviously then, neither a court nor a jury determined whether "there [were] no mitigating factors sufficient to preclude the imposition of the death sentence." (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(g), (h).) Under the circumstances of this case, no sentencing hearing took place; thus, no sentencing determination was made. Consequently, it cannot be said that there was a death penalty acquittal.

Defendant next asks this court to reconsider the decision of *People v. Williams* (1983), 97 Ill. 2d 252, and find the death penalty statute unfair because it allows the prosecution to give both an opening and a closing argument. We disagree and decline to depart from the holdings of this court's prior decisions. *People v. Fields* (1990), 135 Ill. 2d 18, 73; *People v. Caballero* (1984), 102 Ill. 2d 23, 47-48; *Williams*, 97 Ill. 2d at 302-03.

## CONSTITUTIONALITY OF THE DEATH PENALTY

Defendant contends that the death penalty statute is unconstitutional because it places a burden of proof on the defendant which does not allow for the meaningful consideration of mitigating evidence. This argument has been previously rejected. *People v. Phillips* (1989), 127 Ill. 2d 499, 542; *People v. Jones* (1982), 94 Ill. 2d 275, 283-84 (discussing argument based on the definition of the word "preclude").

Secondly, defendant contends that the death penalty statute is unconstitutional because it does not sufficiently guard against the possibility of an arbitrary or a capricious death sentence. As defendant notes in his brief, the arguments in support of his second contention have previously been addressed by the court. Looking at the arguments in a cumulative fashion does not persuade this court to depart from our prior holdings. See *People v.*

*Gosier* (1991), 145 Ill. 2d 127, 165 (" 'If all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional' "), quoting *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.

## CONCLUSION

For the reasons set forth above, we affirm the defendant's murder and armed robbery convictions and his sentence of death. The court directs the clerk of this court to enter an order setting Wednesday, September 16, 1992, as the date on which the sentence of death entered by the circuit court shall be carried out. The defendant shall be executed in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The clerk of this court shall send a copy of the mandate to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*