2020 IL App (1st) 161988-U

SIXTH DIVISION
MARCH 20, 2020

No. 1-16-1988

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 1631 (04) |
| | ) | |
| RAY GUERECA, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Mikva and Justice Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The defendant's convictions and sentence are affirmed where: the State proved him guilty beyond a reasonable doubt of aggravated kidnapping and armed robbery; he did not receive ineffective assistance of counsel; and his sentence of 24 years' imprisonment was not an abuse of discretion.

¶ 2   Following a bench trial in the circuit court of Cook County, the defendant-appellant, Ray Guereca, was convicted of aggravated kidnapping, armed robbery, aggravated battery, and mob action. The defendant was sentenced to a total of 24 years' imprisonment. On appeal, the defendant contends that the State failed to prove him guilty of aggravated kidnapping and armed robbery;

that he received ineffective assistance of counsel; and that his sentence was excessive. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 3                                    BACKGROUND

¶ 4     The State charged the defendant and his co-defendants; Luis Valdez, Gonzalo Guerrero, Elena Rios, and Jose Villalobos; with the aggravated kidnapping of Shaun Jurgens and Raymond Jerz; with the first degree murder of Raymond Jerz; with armed robbery and aggravated battery of Shaun Jurgens; and with mob action. A simultaneous, but severed bench trial of the defendant and his co-defendants commenced, and the following evidence was presented.

¶ 5     On February 10, 2012, two friends, Raymond Jerz and Shaun Jurgens, attended a party in Chicago near 26th Street and Kedzie Avenue. Both Jerz and Jurgens lived in the suburbs, and a friend had driven them to the party in her car with some other friends. At the party, the driver's purse was stolen. Her car keys were in her purse and so the group had no way to get home. At approximately 3:00 a.m., Jerz and Jurgens walked to a nearby restaurant, Los Comales, while the rest of their friends waited at the party with the car. Inside the restaurant, Jerz and Jurgens ordered some food and sat down to eat. As they ate, they started making phone calls to try to find someone to give them a ride home.

¶ 6     Jurgens went into the restroom at Los Comales, where he encountered the defendant, along with two of his co-defendants, Luis Valdez and Jose Villalobos. Jurgens testified that the defendant and his friends were being "loud and obnoxious" and that he could tell they were "gang bangers." He was not afraid of them. He believed they were members of the Satan Disciples street gang, or an affiliated and larger street gang, known as Folks. Jurgens had been a member of the Satan Disciples street gang between the ages of 13 and 19. Although he was no longer a member of the

gang, he still had the six-point star and pitchfork tattoo, which was indicative of gang membership, on his right leg.[1]

¶ 7    Jurgens approached the defendant, Valdez, and Villalobos and offered them $20 to drive him and his friends to the nearest train station so that they could get home. Jurgens, believing them to be members of the Satan Disciples or Folks street gang, displayed the tattoo on his leg. In response, the defendant and his friends told Jurgens: "Hey, it's cool, Folks. We'll help you out."

¶ 8    However, the defendant and his friends were only pretending to be members of the Satan Disciples or Folks street gang. They were actually members of the Latin Kings street gang, who are rivals of the Satan Disciples. And the Latin Kings street gang is a part of the larger gang faction known as the People Nations, who are rivals of the Folks street gang. Jurgens testified that had he suspected that the defendant and his friends were members of the Latin Kings or People Nations, he "wouldn't have been talking to them."

¶ 9    All of the men exited the restroom. Jurgens told Jerz that the defendant and his group were going to pick up their other friends who were still at the party, and then give them all a ride to the train station. The group left Los Comales and entered a minivan behind the restaurant. Jerz and Jurgens shared the middle-row seat with Valdez and Villalobos. The defendant got in the driver's seat. Co-defendant Elena Rios was sitting in the passenger's seat. Two other women, Stephanie Del Rio and Tatiana Inovskis, were sitting in the backseat.

¶ 10    Del Rio testified that earlier in the night on February 10, 2012, the defendant picked her and Invoskis up in the van to take them to Rios' house. Valdez was also in the van. After drinking at Rios' house for a while, the defendant, Del Rio, Rios, Invoskis, and Valdez left and drove around

---

[1]The record reflects that Jerz had never been affiliated with any gangs.

in the van for three hours. Villalobos joined the group at some point. At around 3:00 a.m., the group stopped at Los Comales to use the restroom. The defendant parked the van in the back parking lot, and everyone except for Invoskis went inside to use the restroom.

¶ 11    When everyone returned to the van, Jerz and Jurgens came back with the defendant, Valdez, and Villalobos. Del Rio had never seen either Jerz or Jurgens before. She also noticed that the defendant's hat was now tilted to the right side, which was "unusual" because she knew he was a member of the Latin Kings, and Latin King members always tilt their hat to the left side. In fact, the defendant's hat had been tilted to the left when he entered Los Comales. Del Rio mentioned the direction of the defendant's hat to another man sitting next to her in the van, but the man pinched her, which she took to mean "calm down."[2]

¶ 12    When the defendant pulled out of Los Comales parking lot, Jurgens noticed that he began driving the van in the opposite direction from 26th Street and Kedzie Avenue, where his friends were waiting. This caused Jurgens to feel concerned, although he and Jerz remained silent. The defendant drove for five minutes into a neighborhood with which Jurgens was unfamiliar. The neighborhood turned out to be in "the heart of Latin Kings territory." During the five-minute drive, the defendant made a phone call to some of his friends and pretended to be a member of the Folks street gang, saying things such as "folks, we got this." He also pointed to some people at a gas station and called them "Flakes," a derogatory term for Latin King members.

¶ 13    The defendant stopped the van on a residential street in front of a garage door, at the mouth of an alleyway. Everyone exited the van, except for Jerz and Jurgens. An SUV then pulled up right next to the van and more people emerged from the SUV. Suddenly, Jerz and Jurgens were dragged

_____

[2]The record does not identify the man sitting next to Del Rio in the van.

out of the van and into the street, in a space between the van and the SUV. The defendant, his co-defendants, and the others who had pulled up in the SUV began beating Jerz and Jurgens. Jurgens felt himself being punched and kicked all over his body. He heard people yelling "Kill them, Folks," "Kill them SDs," and "SDK," which stands for Satan Disciples Killer.

¶ 14    Jurgens managed to temporarily break away from the people beating him. He saw Jerz down the street being kicked and punched by at least five people. Jurgens ran toward Jerz, but the defendant hit him across the forehead with a metal pipe, which "totally dazed" him. He then ran across the street to try to escape. As he ran, he felt the defendant, Valdez, and co-defendant Gonzalo Guerrero grabbing at him. They pulled off his coat, watch, and bracelet. As Jurgens slipped out of his coat, he was able to break away from the men chasing him. The defendant and Guerrero continued to chase and try to hit Jurgens, yelling "Let's get his ass." Jurgens was still running when he suddenly heard three gunshots, which caused him to freeze.

¶ 15    Meanwhile, Miguel Humberto Martinez was driving home from work. His house was located close to where the van and SUV had parked. Martinez testified that as he pulled up to the entrance to the alley, he saw the defendant, Valdez, and Guerrero beating up Jurgens. Martinez honked his car horn, and then saw Jurgens briefly escape, followed by the defendant and Guerrero chasing him. He looked across the street and saw Jerz trying to cover his face as Valdez, Rios, and others beat him. He saw Jerz try to get up, but Valdez grabbed him and held him down while the others continued to punch him.

¶ 16    The defendant's group then left Jerz lying in the street and entered the van. Valdez began driving the van, which accelerated toward Jerz. Martinez thought the van was going to run over Jerz, but it turned last minute and sped down a different street. Right then, Villalobos appeared

with a gun and shot Jerz three times in the back.

¶ 17    Right after Jurgens heard the gun shots, he ran down the street to "try to find any kind of help." He ran down to a street corner, and realized that the defendant and Guerrero were no longer chasing him. His cell phone was dead so he could not call anyone for help. He then heard police sirens coming from the area he had last seen Jerz, so he headed back. When he returned to the area, he saw that the van, the SUV, and the people who had beat him were all now gone. Jurgens saw Jerz lying face down on the street. Jerz was nonresponsive and covered in blood and bullet holes; he was later pronounced dead at the scene.

¶ 18    Investigators arrived and found Jurgens' coat and broken bracelet at the scene. They also discovered the defendant's cell phone and recovered surveillance video from Los Comales, which showed the defendant and his group leaving with Jerz and Jurgens. Jurgens later identified the defendant in a lineup as the individual who hit him on the head with a metal pipe, and as one of the individuals who took his coat and bracelet and chased him down the street. Martinez also identified the defendant in a lineup.

¶ 19    The State introduced a series of recorded interviews between the defendant and Detective Gregory Jacobson. During the interview process, the defendant initially denied shooting Jerz, hitting Jurgens with a metal pipe, or taking anything from Jurgens. Later, the defendant admitted to hitting Jurgens with a weapon, but continued to insist that he never touched Jerz. The defendant asked Detective Jacobson if he would receive leniency if he identified the person who shot Jerz. Detective Jacobson responded that "[t]here's ways to get around certain things, ok." The defendant subsequently identified Villalobos as the shooter. After doing so, he asked if he could leave. In response, Detective Jacobson told the defendant: "I don't know if you're going to be able to leave,

ok? But I'll tell you what, it's making it less worse for you because you're telling me the truth."

¶ 20    At that point in the interview process, the defendant admitted that Jerz and Jurgens entered the van because they thought the defendant and his friends were Satan's Disciples. The defendant insisted that he did not mean to kill anyone, and he also denied there was any kind of plan conceived while driving the van. Detective Johnson told the defendant that there was a "big difference" between robbery and murder. He continued: "I'm a homicide detective. I could give a f*ck about robberies. I don't care about robberies. You can go rob all the people you want. You kill somebody? Now I'm out there." Detective Jacobson then asked the defendant: "Did you guys rob those guys? Was that the plan? Doesn't make you a murderer." To which the defendant answered: "Yeah yeah, that's the plan."

¶ 21    The defendant then told Detective Jacobson that Valdez suggested they sell cocaine to Jerz and Jurgens. The following exchange occurred:

> "[DETECTIVE JACOBSON:] And then do what?
>
> [THE DEFENDANT:] Take their money from them.
>
> [DETECTIVE JACOBSON:] Take their money? Rob them?
>
> [THE DEFENDANT:] Yeah, if anything, yeah.
>
> [DETECTIVE JACOBSON:] Which is, which is fine, you didn't
>
> plan to kill him. So you didn't plan to kill him? You were gonna rob
>
> him?"
>
> [THE DEFENDANT:] Yeah
>
> [DETECTIVE JACOBSON:] Okay. Who were you gonna rob?
>
> [THE DEFENDANT:] [Jurgens.]

[DETECTIVE JACOBSON:] And the other guy too?

[THE DEFENDANT:] Uh-huh."

Later in the interview process, the defendant explained that Villalobos lived "two houses away" from where Jerz was shot, and that during the attack on Jerz and Jurgens, Villalobos said he was going to his house to get cocaine, not a gun.

"[DETECTIVE JACOBSON:] Did he go in to get a gun to rob him? Was that the plan?

[THE DEFENDANT:] Probably, man…

[DETECTIVE JACOBSON:] Don't tell me probably. You gotta tell me in your words.

[THE DEFENDANT:] He went in there to get the coke, but he got a gun though. I guess he heard the commotion, you know?

[DETECTIVE JACOBSON:] If you were gonna rob him, you're not gonna go get coke and give it to him, right?

[THE DEFENDANT:] Nah, we were, we were gonna give him coke and take his money."

¶ 22    The interview then returned to the initial encounter with Jurgens in the bathroom:

"[DETECTIVE JACOBSON:] What's the plan now? Is the plan to kill 'em?

[THE DEFENDANT:] No.

[DETECTIVE JACOBSON:] What's the plan then?

[THE DEFENDANT:] To rob him."

The defendant tried to clarify "where he [stood]" with the charges, telling Detective Jacobson, "I didn't say all this just to f*ck myself." Detective Jacobson noted that the defendant was "helping [him] out." Detective Jacobson also told the defendant: "I'm not a robbery guy, ok? I don't care about robberies. I care about who killed that guy." The defendant subsequently identified Villalobos in a photograph as the shooter. The interview process concluded with the following exchange:

> "[DETECTIVE JACOBSON:] When you guys get in the van, okay,
>
> the plan is to do what? You told me before, what is it?"
>
> [THE DEFENDANT:] To rob them."

¶ 23    After the close of the State's case, the defendant did not testify or offer any evidence in his defense.

¶ 24    At the conclusion of the trial, the trial court began its ruling by noting that the crimes occurred just four blocks from the courthouse. It also stated that it was considering the evidence against each defendant independently, including the defendant's statements he made to Detective Jacobson. When the trial court discussed the events, the trial court again noted the courthouse's proximity to both Los Comales and the Latin Kings neighborhood where Jerz was shot.

¶ 25    The trial court acquitted the defendant of first degree murder,[3] but found him guilty of aggravated kidnapping, armed robbery, aggravated battery, and mob action. The trial court stated:

> "[Jurgens] made an [*sic*] horrendous mistake and he showed a tattoo
>
> of the Satan Disciples and saying that he's old school Satan
>
> Disciples. And that set off the chain of events. Now, I do not believe

_____

[3]Only co-defendant Villalobos was found guilty of first degree murder.

that up to that point that there was criminal intent that any of [the] defendants had formed against [Jerz and Jurgens,] but from that moment that's exactly what happened and [the defendant, Villalobos, and Valdez] did form criminal intent and they acted quickly and immediately and it was like being put into a spider's web where somebody just falls into the web and cannot get out.

***

As to what happened at Los Comales restaurant and getting from that restaurant to the borderline where the crime scene actually occurred, I do find that the deceit, the lying, the false flagging, the tilting of the hats from one direction to another, inducing and deceiving [Jerz and Jurgens] to get into the vehicle under the pretense of getting a ride and taking them from one location that was supposed to be safe on their way home to another location that couldn't have been more dangerous, into the heart of the Latin Kings territory where violence was about to take place and which was starting to be planned in the car among the co-defendants, I do find that that does constitute aggravated kidnapping ***[.]

***

[I]t is clear that a savage beating took place. This is gang activity in its truest nature. The only reason this happened is because they believed that [Jurgens] was a Satan Disciple. For that reason alone they thought it was incumbent upon them to take [Jerz and Jurgens]

- 10 -

into their own territory and do as much damage as they could ***.

And the taking of the property was done together as well. It was, I

believe, part of a plan to rob and to beat."

¶ 26　Following his convictions, the defendant filed a motion for a new trial, which was denied. At the sentencing hearing, the State asked for the trial court to sentence the defendant to the maximum sentence of 30 years. In aggravation, Jerz's mother read a victim impact statement, telling the defendant and his co-defendants: "[Y]ou may not have shot my son, but you all have his blood on your hands, and I hope you pay for that for the rest of your life." The State reminded the trial court of the defendant's lead role in the crimes. The State also introduced the defendant's criminal record, which includes: being adjudicated delinquent for unlawful use of a weapon and sentenced to probation; violating that probation; being convicted as an adult of aggravated battery and being sentenced to boot camp; and being convicted as an adult of the misdemeanors of gang loitering and reckless conduct.

¶ 27　In mitigation, defense counsel emphasized that the defendant was only 21 years old at the time of the incident and claimed that the defendant had strong rehabilitative potential. In allocution, the defendant apologized to Jerz's family. The defendant also told the trial court: "Now, as you know, sir, I grew up two blocks, three blocks away from here, sir. And I know you're familiar with the neighborhood. It was hard growing up, sir."

¶ 28　In its sentencing decision, the trial court noted that the defendant, along with Valdez, "took the lead in trying to secure [Jerz and Jurgens] to get them to another location." The court also stressed the seriousness of the crimes, stating they were "done for the sole purpose of asserting their superiority *** this is gang-banging in its purest extent." The court acknowledged that the

defendant and his co-defendants were "all young people," but also that they all had criminal backgrounds.

¶ 29    The court then sentenced the defendant and his co-defendants to individualized sentences. The defendant was sentenced to concurrent sentences of: 24 years for the aggravated kidnaping of Jurgens; 24 years for the aggravated kidnaping of Jerz; 15 years for the armed robbery of Jurgens; 5 years for the aggravated battery of Jurgens; and 3 years for mob action.

¶ 30    Following sentencing, the trial court asked the defendant if he had any questions. The defendant responded: "Yes, sir, I mean, 24 years, your Honor, that's a long time, your Honor. I mean, he was never forcefully kidnapped, sir." The trial court explained to the defendant, "You deceived him and lied to him and you got him to a place where he was only facing danger. *** And now Mr. Jerz is dead." The defendant again complained that "24 years is a long time" to which the court responded, "It's supposed to be."

¶ 31    The defendant filed a motion to reconsider sentence, arguing that his sentence was excessive in view of his background and the nature of the offense. The trial court denied the motion, stating that "the aggravating factors were substantial" and that the defendant's sentence "was not only in the range but well deserved." This appeal followed.

¶ 32                               ANALYSIS

¶ 33    We note that we have jurisdiction to review the trial court's judgment, as the defendant filed a timely notice of appeal. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 34    The defendant presents the following four issues: (1) whether the State proved him guilty of aggravated kidnapping beyond a reasonable doubt; (2) whether the State proved him guilty of armed robbery beyond a reasonable doubt; (3) whether he received ineffective assistance of

counsel when his defense counsel failed to suppress his confession to Detective Jacobs; and (4) whether his sentence of 24 years' imprisonment was excessive. We take each issue in turn.

¶ 35    The defendant first argues that the State failed to prove him guilty of aggravated kidnapping beyond a reasonable doubt. Specifically, he claims that the State failed to prove that he intended to secretly confine Jerz and Jurgens, which is an element of aggravated kidnapping. He argues that he and his group never forced Jerz and Jurgens to board the van, and that Jerz and Jurgens were never physically restrained once inside the van nor were they prevented from leaving the van. According to the defendant, Jerz and Jurgens were never completely isolated from meaningful contact with the public, especially because Jurgens had his cell phone with him during the five-minute drive. In the alternative, the defendant argues that the asportation[4] of Jerz and Jurgens was merely incidental to the battery committed against them, which was "the gist of the case." He claims that if he and his co-defendants had merely dropped Jerz and Jurgens off instead of beating them, they never would have been exposed to any danger, and so his conviction for aggravated kidnapping cannot be sustained. He asks us to reverse his aggravated kidnapping conviction[5], or reduce it to unlawful restraint.

¶ 36    The State has the burden of proving each element of an offense, beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. When a defendant challenges the sufficiency of the evidence, the proper standard of review is; whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime

---

[4]Asportation has long been defined as either a "carrying," "carrying away," or "removal" of goods "from one place to another," but the concept of asportation applies also to *persons*, pursuant to kidnapping statutes. *People v. Casiano,* 212 Ill. App. 3d 680, 686 (1991) (quoting (Black's Law Dictionary 105 (5th ed. 1979)).

[5]Although the defendant was actually convicted of *two* counts of aggravated kidnapping, we will refer to it as one conviction for the sake of clarity.

beyond a reasonable doubt. *Id*. A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt as to the defendant's guilt. *Id*.

¶ 37    The operative offense for this analysis is aggravated kidnapping pursuant to 720 ILCS 5/10-2(a)(3) (West 2012).

> "A person commits the offense of kidnapping when he or she knowingly: (1) and secretly confines another against his or her will; (2) by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will; or (3) by deceit or enticement induces another to go from one place to another with intent secretly to confine that other person against his or her will."
>
> 720 ILCS 5/10-1(a) (West 2012)

And a person commits the offense of aggravated kidnaping when he "commits kidnapping and *** inflicts great bodily harm, other than by the discharge of a firearm, or commits another felony upon his or her victim." 720 ILCS 5/10-2(a)(3) (West 2012).

¶ 38    The element at issue is the intent to secretly confine. Although the kidnapping statute does not define "secret confinement," our supreme court has defined "secret" as "concealed, hidden, or not made public," and has defined "confinement" as "the act of imprisoning or restraining someone." *People v. Gonzalez*, 239 Ill. 2d 471, 479 (2011). "[S]ecret confinement can be shown through evidence that the defendant isolated the victim from meaningful contact with the public." *Id*. at 480.

¶ 39    The defendant concedes that a victim may be "secretly confined" even while inside a vehicle moving on a public roadway in view of others. *Id*. at 482 ("in certain instances[,] keeping a victim in a public place may be more effective than taking the victim to a location out of the public's view"). Nonetheless, the defendant still avers that Jerz and Jurgens were never secretly confined because they were never forced to board the van or physically restrained once inside it. However, intent to secretly confine is ordinarily proved through circumstantial evidence and inferences. *People v. Calderon*, 393 Ill. App. 3d 1, 7 (2009). The defendant may not have forced Jerz and Jurgens to board the van with physical strength, but he and his friends did use trickery and deceit to lure them into entering the van. The defendant and his cohorts went to great lengths to deceive Jerz and Jurgens into believing they were part of the same gang family. In other words, they used "deceit" to induce the victims into the van so that they could be transported into Latin Kings territory. Certainly, neither Jerz nor Jurgens consented to that. Jurgens testified that as soon as he realized the van was driving in the opposite direction from where his friends were located, he became "concerned." He and Jerz were taken into an unfamiliar neighborhood by people Jurgens thought to be gang bangers. Even though the defendant and his group never physically restrained Jerz and Jurgens from exiting the van, it can easily be inferred that the two men were too afraid to attempt to escape once they realized something was amiss.

¶ 40    We find *Calderon*, 393 Ill. App. 3d 1, to be instructive. There, the victim "was not physically restrained in the car ***, and [the victim] did not attempt to flee from the car ***." *Id.* at 9-10. However, the victim "testified he did as he was told out of fear that the defendant had a weapon in his pocket and the friends the defendant referred to in the SUV would beat him." *Id.* We found that to be sufficient circumstantial evidence from which the trier of fact could

determine that the defendant's acts proved, beyond a reasonable doubt, that he intended to secretly confine the victim. *Id*.

¶ 41    The defendant in this case emphasizes that Jurgens had his cell phone during the van ride, and so he argues that Jerz and Jurgens were never meaningfully isolated from the public. Yet, the record reflects that Jurgens' phone was dead by that time. And even assuming *arguendo* that Jurgens' phone was working, it is highly doubtful under these facts, that the defendant and his group would have allowed Jurgens to use his phone to call for help had he tried.

¶ 42    Most importantly, the defendant and his group clearly *deceived* Jerz and Jurgens and thereby induced them to enter the van. The defendant and his cohorts then continued to pretend to be members of the Satan Disciples as they drove Jerz and Jurgens to a different location in order to isolate them away from safety. We are not persuaded by the defendant's argument that the street where they beat Jerz and Jurgens was "not a secluded area, but a residential neighborhood" where "their actions were intentionally visible to anyone walking or driving home." The beatings took place just after 3:00 a.m. in "the heart of Latin Kings territory." No one knew where Jerz and Jurgens were at that time, including their friends waiting for them at the party. As the State points out, the defendant and his group could have simply attacked Jerz and Jurgens at Los Comales; but they wanted to isolate them from any possible help or safety, so they deceived them into entering the van and then drove them to a more dangerous and secluded area. See *People v. Quintana*, 332 Ill. App. 3d 96, 106 (2002) (a significant danger arises from the potential of more serious criminal activity due to the privacy of the final location).

¶ 43    Under the circumstances presented at trial, it was for the trier of fact to resolve whether the defendant acted with the requisite intent to secretly confine Jerz and Jurgens. The trial court having

so found, we find no basis to disturb its verdict.

¶ 44   Alternatively, the defendant argues that his aggravated kidnapping conviction cannot stand because Jerz and Jurgens' "short and temporary asportation was incidental to the battery committed against them and did not create a significant danger to them independent to that posed by the battery." He claims that his group's intention was to "take Jurgens and Jerz to an open area where they could publicly beat" them, and so the short drive of transporting them to the Latin Kings neighborhood was "intrinsically linked to the intended offense of battery" and did not create an independent offense of kidnapping.

¶ 45   A defendant should not be convicted of kidnapping where the asportation or confinement of the victim was merely incidental to another crime. *People v. Eyler*, 133 Ill. 2d 173, 199 (1989). This court has established four factors to consider when determining whether an asportation or confinement is merely ancillary to another offense, or whether it rises to the level of an independent crime of kidnapping. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225–26 (2009). These factors include: (1) the duration of the asportation or confinement; (2) whether the asportation or confinement occurred during the commission of a separate offense; (3) whether the asportation or confinement is inherent in the separate offense; and (4) whether the asportation or confinement created a significant danger to the victim independent of that posed by the separate offense. *Id.* The question of whether an asportation was incidental to another crime "challenges incriminating inferences that may have been drawn by the trier of fact from the evidence," and so the correct standard of review is that which applies to a challenge of the sufficiency of the evidence. *People v. Sumler*, 2015 IL App (1st) 123381, ¶ 53.

¶ 46   We begin our analysis with the first factor, the duration of the asportation or confinement.

Although Jerz and Jurgens were inside the van for only five minutes, "it is well settled that a kidnaping conviction is not precluded by the brevity of the asportation." *People v. Jackson*, 331 Ill. App. 3d 279, 294 (2002). Indeed, this court has consistently upheld kidnapping convictions where the asportation lasted five minutes or less. See *Siguenza-Brito*, 235 Ill. 2d at 226.

¶ 47    Looking at the second factor, whether the asportation or confinement occurred during the commission of a separate offense, it strongly weighs against the defendant because the asportation occurred *prior to*, rather than during, the battery. We note that in his secret confinement argument, the defendant stressed that Jerz and Jurgens were never physically touched during the drive. Consequently, the battery offense could not have occurred *during* the asportation.

¶ 48    The defendant concedes that the third factor, whether the asportation or confinement is inherent in the separate offense, weighs against him. In order for asportation or confinement to be inherent in a separate offense, it must constitute an element of that offense. *Sumler*, 2015 IL App (1st) 123381, ¶ 59. And asportation and confinement are not elements of battery. *Id*.

¶ 49    Finally, we consider the fourth factor, whether the asportation or confinement created a significant danger to the victim independent of that posed by the separate offense. As discussed above, the entire point of transporting Jerz and Jurgens to the other location was to isolate them from any possible help or safety. By moving Jerz and Jurgens away from Los Comales and to a secluded neighborhood, the defendant and his group reduced the likelihood of someone from the public interfering with the beatings. See *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 28 (the defendant heightened the danger to the victim by moving her to a secluded area and decreasing the likelihood that anyone would see or hear what was transpiring, especially in the dark in the middle

of the night).

¶ 50    Moreover, the defendant and his group brought Jerz and Jurgens into "the heart of Latin Kings territory," where there was *additional* possible danger other than from the defendant and his group. Contrary to what the defendant claims, even if he and his group had merely dropped off Jerz and Jurgens without beating them, they would have been stranded in an unknown neighborhood, in the middle of the night, with no way to leave. And Jurgens, as a former member of the Satan Disciples, would have been exposed to even more danger in a Latin Kings neighborhood. Thus, after weighing all four factors, it is clear that the aggravated kidnapping offense was separate from the aggravated battery offense.

¶ 51    In sum, the State proved the defendant guilty of aggravated kidnapping beyond a reasonable doubt, including proving the requisite element of secret confinement; and the aggravated kidnapping offense was not incidental to the aggravated battery offense. We accordingly affirm the defendant's aggravated kidnapping conviction. In light of our proceeding analysis, we need not address the defendant's argument that his aggravated kidnapping conviction should be reduced to unlawful restraint.

¶ 52    The defendant next argues that the State failed to prove him guilty of armed robbery. He claims that he and his group never took possession of Jurgens' coat and bracelet, and that the items instead were merely pulled off during the physical struggle. In support of his argument, the defendant emphasizes that Jurgens' coat and bracelet were recovered at the scene. The defendant further claims that his intention was to only beat Jerz and Jurgens, and not to rob them.[6]

¶ 53    The defendant's argument again challenges the sufficiency of the evidence, for which the

---

[6]The defendant does not contest that he and his group were "armed with a dangerous weapon, other than a firearm, to wit: a bludgeon."

proper standard of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Gray*, 2017 IL 120958, ¶ 35. His challenge is to his conviction for armed robbery: "A person commits robbery when he or she knowingly takes property *** from the person or presence of another by use of force or by threatening the imminent use of force." 720 ILCS 5/18-1(a) (West 2012). And "a person commits armed robbery when he or she violates Section 18-1; and he or she carries on or about his or her person or is otherwise armed with a dangerous weapon other than a firearm." 720 ILCS 18-2(a)(1) (West 2012).

¶ 54 The defendant concedes that a defendant need not take possession of the property in order to be convicted of robbery, (*People v. Tiller*, 94 Ill. 2d 303, 316 (1982)), but nonetheless contends that we should still reverse his conviction because Jurgens' coat and bracelet were simply "lost" during a "fight." This is an absurd argument under the facts of this case. There was never a "fight" as the defendant portrays. Instead, it was a one-sided beating of Jerz and Jurgens by the defendant and his group. And during the course of the beating, the defendant and his group robbed Jurgens, forcefully ripping off his coat, bracelet, and watch.

¶ 55 It is immaterial that Jurgens' coat and bracelet were recovered at the scene. The offense of robbery is complete when force or threat of force causes the victim to part with property against his will. *People v. Gaines*, 88 Ill. 2d 342, 367 (1981). Conviction for robbery was not contingent upon the defendant carrying away Jurgens' property after forcefully removing those items from Jurgens. *Id.* Reviewing the facts of the case, it is reasonable to infer that the defendant and his cohorts abandoned Jurgens' items when they were interrupted by Martinez honking his car horn and/or Villalobos shooting Jerz. Moreover, Jurgens testified that the defendant and his group also

took his watch, and the record reflects that his watch was not recovered at the scene.

¶ 56 Undoubtedly, the defendant and his group intended to beat *and* rob Jerz and Jurgens as part of their gang rivalry. The circumstantial evidence in this case clearly established that the defendant and his co-defendants knew that their actions would result in Jurgens losing his property against his will, *i.e.,* grabbing at Jurgens and his personal items as he ran away from them. See *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 26 (a defendant's knowledge is generally established by circumstantial evidence rather than direct proof, and a defendant acts with knowledge when he is consciously aware that his conduct is practically certain to cause a particular result). Further, the circumstantial evidence is corroborated by the defendant's confession to Detective Jacobson that he intended to rob Jerz and Jurgens.

¶ 57 The trial court even noted how the defendant and his group intended to rob Jerz and Jurgens *in addition to* beating them so that they could "do as much damage as they could" as part of their gang rivalry. And it is irrelevant when that intent to rob was formed. See *People v. Kidd*, 175 Ill. 2d. 1, 43 (1996) ("If, as the result of a quarrel, a fight occurs in which one of the parties is overcome, and the other then, without having formed the intention before the [attack] began, takes the money of the vanquished one, the offense committed is robbery.") (quoting *People v. Jordan*, 303 Ill. 316, 319 (1922)). Thus, it does not matter if the defendant and his group originally planned to only beat Jerz and Jurgens, and then later decided to also rob them. It was nonetheless robbery. Accordingly, we affirm the defendant's conviction of armed robbery.

¶ 58 Next, the defendant claims that he received ineffective assistance of counsel when his defense counsel failed to suppress his videotaped confession to Detective Jacobson. The defendant avers that Detective Jacobson "coaxed" him numerous times, through coaching and promises of

leniency, into stating that he and his co-defendants planned to rob Jerz and Jurgens. The defendant accordingly argues that his confession was involuntary and so his defense counsel should have suppressed it.

¶ 59    Claims of ineffective assistance of counsel are reviewed through a two-part test that was announced by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court. *People v. Burrows*, 148 Ill. 2d 196, 232 (1992). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that (1) counsel's performance was objectively unreasonable under prevailing professional norms and (2) the defendant was prejudiced. *People v. Veach*, 2017 IL 120649, ¶ 30 (citing *People v. Domagala*, 2013 IL 113688, ¶ 36). Prejudice is a reasonable probability of a different result of the proceeding absent counsel's deficiency, and a reasonable probability is probability sufficient to undermine confidence in the outcome. *Id.* When a reviewing court addresses an ineffective assistance of counsel claim, it need not apply the two-part test in numerical order. *Burrows*, 148 Ill. 2d at 232. We review claims of ineffective assistance of counsel *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 60    Despite the defendant's lengthy argument that his confession was involuntary, we need not address that issue because he cannot demonstrate prejudice. As discussed *supra*, the evidence of the defendant's intent to rob Jurgens was overwhelming in this case. Notably, the defendant's confession was not considered as evidence in his co-defendants' trials, and none of his co-defendants similarly confessed that they had intended to rob Jerz and Jurgens. Yet, the defendant's co-defendants were *still* found guilty of armed robbery. This establishes that even had defense counsel successfully suppressed the defendant's videotaped confession, it cannot be said that it

would have changed the outcome of the trial. Thus, the defendant was not prejudiced. See *People v. Miramontes*, 2018 IL App (1st) 160410, ¶ 19 (a defendant is prejudiced when there is a reasonable probability that there would have been a different outcome in the defendant's trial). Accordingly, we find that defense counsel did not render ineffective assistance.

¶ 61 Finally, the defendant challenges his sentence of 24 years' imprisonment. He argues that the trial court did not consider his young age at the time of the offense (21 years old), his strong family ties, or his limited criminal background, which led to an excessive sentence. The defendant also argues that the trial court improperly focused on the proximity of the crimes to the courthouse, and that "[t]he court's frustration with gangs in its backyard blinded it to [the defendant's] rehabilitative potential."

¶ 62 The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In sentencing, the trial court must consider "all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of [the] defendant's conduct in the commission of it." *Quintana*, 332 Ill. App. 3d at 109. The trial court, however, is given great discretion in determining a sentence within the limits set by the legislature. *People v. Haley*, 2011 IL App (1st) 093585, ¶ 63. This court will not substitute its judgment for that of the trial court merely because it may have balanced the appropriate factors differently. *People v. Benford*, 349 Ill. App. 3d 721, 737 (2004). And where a sentence falls within the statutorily mandated guidelines, it is presumed to be proper. *Id.* A trial court's sentence will not be disturbed on review absent an

abuse of discretion. *People v. Johnson*, 347 Ill. App. 3d 570, 573-74 (2004). An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable or where no reasonable person would take the view adopted by the trial court. *Id.*

¶ 63    We agree with the State that the trial court did not abuse its discretion in sentencing the defendant. The sentencing range for the defendant's convictions was 6 to 30 years' imprisonment, and the State requested the maximum of 30 years. Thus, the defendant's sentence of 24 years' imprisonment is well within the statutory range, so we must presume it to be proper.

¶ 64    Furthermore, the trial court explicitly stated that it considered the mitigating factors, including the defendant's youth. When the court mentioned the defendant's youth, it also brought up the defendant's criminal background. While the defendant claims to have a "limited criminal background," the record reveals that he was adjudicated delinquent for unlawful use of a weapon and sentenced to probation, that he violated that probation, and that he was convicted as an adult of aggravated battery, gang loitering, and reckless conduct. Moreover, the trial court properly focused on the seriousness of the crimes, referring to the incident as a "heinous event" that "never should have happened." And the court appropriately noted the defendant's lead role in the crimes.

¶ 65    The defendant's argument that the trial court sentenced him to 24 years' imprisonment "as punishment for the proximity of his crime to the courthouse" is preposterous, and not based on anything identifiable in the record. The few comments made in passing by the trial court regarding the location of the crimes merely acknowledged that the events happened very near the courthouse. Certainly, the court was entitled to comment on the facts of the case. Even the defendant himself noted the proximity. Nothing in the trial court's comments indicate that it considered the location to be an aggravating factor, especially when viewed in context of the entire record. See *People v.*

*Charleston*, 2018 IL App (1st) 161323, ¶ 32 ("the reviewing court should not focus on a few words or statements of the trial court; rather, the determination of whether or not the sentence was improper must be made by considering the entire record as a whole").

¶ 66    Despite the defendant's argument to the contrary, the record reflects that the trial court carefully considered all the relevant factors and crafted an appropriate sentence well within the statutory range. Accordingly, we affirm the defendant's convictions and cumulative sentence of 24 years' imprisonment.

¶ 67                                CONCLUSION

¶ 68    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 69    Affirmed.